Bertram ZWEIBON et al., Plaintiffs,

v.

John N. MITCHELL et al., Defendants.

Civ. A. No. 2025–71.

United States District Court,
District of Columbia.

July 20, 1973.

Nathan Lewin, Washington, D. C., for plaintiffs.

Earl Kaplan, Edward S. Christenbury, Kevin T. Maroney, Benjamin C. Flannagan, Dept. of Justice, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

JOHN H. PRATT, District Judge.

Upon consideration of plaintiffs' motion for partial summary judgment and the cross-motion by the defendants for summary judgment, pursuant to Rule 56

of the Federal Rules of Civil Procedure, the affidavits and exhibits of record, and the Court being fully advised, finds the facts and states the conclusions of law as follows:

### Findings of Fact

1. The sixteen plaintiffs during the period of time covered by this action were members of or associated with the Jewish Defense League (JDL), an organization with headquarters in New York City.

2. The defendant John N. Mitchell served as the Attorney General of the United States during the years 1969–1972, which encompasses the period of the acts complained of. The defendants Malcolm J. Barrett, Alfred E. Camire, H. F. Doherty, Anthony T. Drabik, A. M. Gansky, Gerald C. Holland, R. W. Patterson, Eddie A. Sodolak and W. R. Sweeney are special agents or special employees of the Federal Bureau of Investigation (FBI).

3. This action is brought under Title 18 U.S.Code §§ 2510–2520 for damages imposed by that statute resulting from alleged unlawful electronic surveillance overhearings of plaintiffs' telephone conversations during the month of October, 1970 and from January 5, 1971 through June 30, 1971.

4. The defendant special agents and employees of the FBI, acting under the direction of the Attorney General, summarized the overhearings of the plaintiffs' conversations during the period the telephone at the JDL headquarters was surveilled. The summaries or logs of plaintiffs' conversations have been made available to the plaintiffs by the defendants.

5. This action grows out of the admission by the Government, in open court in the consolidated cases of United States v. Bieber et al., 71 CR 479 (E.D. N.Y.) and United States v. Joffe et al., 71 CR 480 (E.D.N.Y.) on July 6, 1971, that conversations of certain defendants in the foregoing cases, all members of the JDL, had been overheard during the course of a national security electronic surveillance.

6. In a memorandum for the Attorney General dated September 14, 1970, the Director of the FBI requested that a surveillance of the telephone of the JDL headquarters be authorized during the month of October, 1970 on the occasion of the 25th session of the General Assembly of the United Nations. In the memorandum the Director advised the Attorney General that the JDL has demonstrated a proclivity for demonstrations and violence in the form of attacks on Soviet and Arab diplomatic installations in this country, as well as by participation in demonstrations in New York City, which resulted in injury to private citizens and law enforcement officers. The Director pointed out the concern of the White House that utmost security be afforded to foreign dignitaries visiting New York City and that a surveillance of the telephone of JDL headquarters could provide advance knowledge of any activities of JDL causing international embarrassment to this country. This first authorization was approved by the Attorney General, defendant John N. Mitchell, on September 15, 1970.

7. On January 4, 1971 the Director of the FBI advised the Attorney General that activities by members of the JDL have taken the form of demonstrations targeted against Soviet diplomatic installations, protesting the treatment by the Soviet Government of the Jewish population in Russia; that the demonstrations have been the subject of numerous official protests by the Soviet Government alleging harassment of Soviet personnel and failure on the part of the United States Government to provide adequate protection and security for members of the Soviet diplomatic community in this country; that the renewed tensions in the Middle East and recent decisions by Soviet Courts directed against Soviet Jews have resulted in increased demonstrations against Soviet

diplomatic installations throughout the world; and that a surveillance of the telephone of JDL headquarters could be expected to provide advance knowledge of activities of the group directed against diplomatic establishments, which could cause international embarrassment to the United States. This second authorization to conduct a surveillance was approved by the Attorney General on January 4, 1971.

8. On March 31, 1971 the Attorney General approved the continuation of the previously authorized electronic surveillance of the telephone of the headquarters of the JDL for a three-month period effective April 4, 1971 upon the representation of the Director of the FBI that:

> During the past three months, the authorized surveillance has continued to reveal details of plans by the Jewish Defense League (JDL) to continue its program of harassment of Soviet and Arab bloc diplomats in New York City and Washington, D. C. In each instance the installation furnished otherwise unobtainable information well in advance of public statements by the JDL, thereby allowing for adequate counter-measures to be taken by appropriate police and security forces.

9. Prior to his first authorization on September 15, 1970 for the electronic surveillance of the telephone at JDL headquarters, the Attorney General had conversations with the Director of the FBI was well as a number of other people in the National Security Council and the Department of State concerning the impact of JDL activities on the foreign policy of this country based on JDL actions in 1969 and 1970. The Attorney General was aware of the representations made by the Soviet Government to this country that the United States had failed to provide adequate protection to the diplomatic installations of the Soviet Government in this country and that there was a possibility of retaliation against American diplomats in Moscow as a result of the activities of the JDL.

10. In authorizing the electronic surveillance, the Attorney General relied on the total knowledge received from the Department of State and the National Security Council and from meetings with the Director of the FBI prior to the first authorization of electronic surveillance on September 15, 1970, and these conversations with officials of the above-named agencies continued off and on until approximately March, 1971.

11. Further evidence of the impact which the activities of the members of the JDL had on the foreign relations between this country and the Soviet Union is documented by the following telegrams and memoranda, copies of which were attached as exhibits to defendants' motion for summary judgment:

(a) December 30, 1969, United States Mission to the United Nations (USUN) advises Secretary of State of protest by Ambassador Malik of demonstrations against the Soviet Mission and other incidents and alleged complicity by the United States Government and JDL to sabotage four-power talks. Exhibit B–3(1).

(b) December 30, 1969, Secretary of State advises American Embassy, Moscow concerning protest by Ambassador Dobrynin of property damage to Aeroflot and Tass offices. Dobrynin "alluded to possible adverse repercussions on United States-Soviet relations." The incidents of damage were described by Soviets as part of a series organized by JDL. In the telegram the State Department concluded that "fact of high-level protest increases possibility of retaliation." Exhibit B–4(1).

(c) December 31, 1969, American Embassy, Moscow, forwards to Secretary of State translation of Soviet protest of JDL activities. Included in the translation is the following statement: "The above-mentioned hostile actions against Soviet Mission to the United Nations and other Soviet diplomatic institutions in New York can have serious consequences and responsibility of which rest

fully on the United States Government." Exhibits B–5(1) and B–2(1).

(d) June 4, 1970, American Embassy, Moscow, relates to Secretary of State oral protest by Soviets of May 20 involving incident at Soviet Mission to the United Nations (SMUN) and hinting at retaliation in Moscow as harassment by Zionist organizations continues in New York. Exhibit B–3(3).

(e) June 23, 1970, Secretary of State advises American Embassy, Moscow, of protest by Ambassador Dobrynin to Assistant Secretary Hillenbrand regarding the June 23 break-in by JDL at Amtorg offices in New York. The telegram states: "in closing Dobrynin noted previous Soviet protest on June 4 regarding anti-Soviet activities of Jewish militants in New York. Went on to say that, as Department aware, Soviet Government had kept these incidents from knowledge of Soviet people. Dobrynin added, however, he was not sure security could be maintained and that he felt 'unpredictable consequences' if Soviet public opinion became aware of fact and aroused by anti-Soviet actions of Jewish militants in U.S." Exhibit B–4(3).

(f) On June 30, 1970 the Department of State in a memorandum to the Federal Bureau of Investigation referred to a recent raid by the JDL and requested the assistance of the Federal Bureau of Investigation in taking appropriate action. Attached to the memorandum is an internal State Department memorandum from the Soviet desk advising that "Jewish Defense League activity is beginning to have a negative effect on the conduct of our relations with the USSR * * *. In addition, the JDL's resort to physical violence during its raid on the Amtorg office raises the possibility of Soviet retaliation against United States Embassy personnel in Moscow." Exhibits B–1(1)(2).

(g) July 21, 1970, Secretary of State advises American Embassy, Moscow, of strong protests from SMUN concerning JDL incident at Soviet residences at Glen Cove, Long Island. Exhibit B–4(4).

(h) October 1, 1970, American Embassy, Moscow to Secretary of State submits text of USSR protest on anti-Soviet campaign in United States by JDL. The protest note indicates that the continued provocations will have unfavorable consequences for the relations between the United States and Soviet Union which according to the Soviet Government do not meet the interests either of the Soviet or the American people. Exhibits B–1(3)(4).

(i) December 2, 1970, American Embassy, Moscow, advises Secretary of State that oral statement was delivered by a Soviet Ministry official to an Embassy officer reciting incidents of November 20 involving Tass in Washington, November 22 "outrage" at SMUN, November 24–25 explosion at Aeroflot-Intourist office, and JDL press conferences taking responsibility for the acts. The statement concludes with a warning that United States should not count on patience of "legitimately aroused" Soviet society lasting indefinitely. Exhibit B–3(4).

(j) December 11, 1970, American Embassy, Moscow, to Secretary of State sets forth text of statement from Soviet foreign ministry cancelling the 1971 Bolshoi Ballet and Opera Tour, USA because of hostile activities of JDL. Exhibit B–5(3).

(k) December 31, 1970, Secretary of State to USUN, FBI and Secret Service—Department of State advises "that further incidents of violence would have damaging impact on our overall relations with USSR and possibly trigger reaction against Americans in Soviet Union." Exhibit B–4(6).

(*l*) January 5, 1971, Secretary of State to American Embassy, Moscow, advises of receipt of note from Soviet Union calling attention to continued "hostile campaign" against Soviet Mission and institutions in the United States and accusing United States of

conniving in these criminal acts. The note concludes by stating "that because of its failure to ensure normal conditions for the activities of Soviet institutions in the United States that the United States Government cannot, therefore, count on such conditions being ensured for American institutions in the Soviet Union." The State Department concludes by indicating that the Soviets now raise the threat of officially inspired retaliation. Exhibit B–4(7).

(m) January 7, 1971, Secretary of State advises American Embassy, Moscow, of meeting between Dobrynin and Hillenbrand. Dobrynin condemned activities of JDL and said the Soviets did not want to create an anti-United States feeling in the USSR but there are definite limitations to what one can bear. Exhibit B–4(8).

(n) January 6, 1970, American Embassy, Moscow, advises Secretary of State that Soviet Embassy statement of January 5, 1971 was carried in Moscow papers and includes threat of possible retaliation against United States establishments in USSR. Embassy advises of flock of Soviet telegrams to Embassy expressing indignation of Zionist activities and recites one incident of verbal harassment of a foreign service officer. Embassy also advises of friction in their contacts outside ministry of foreign affairs. Exhibit B–5(5).

(o) January 9, 1971, Secretary of State advises American Embassy, Moscow, regarding receipt of Soviet protests concerning January 8, 1971 explosion at Embassy in Washington. The Soviet protest note refers to JDL's announced intentions to make attempts on the lives of employees in Soviet establishments in the United States. State Department official expressed shock of implied threat of retaliation on Soviet side. Soviet official warned that Soviet authority would have trouble controlling "feelings of our people" in USSR should incidents continue unabated. Exhibit B–3(6).

(p) January 10, 1971, American Embassy, Moscow, advises Secretary of State regarding article in Izvestiya on January 9 concerning JDL acts of terrorism. On evening of January 9 an act of vandalism occurred to the car of AP correspondent in Moscow as well as a separate act of harassment to an Embassy officer. Protest letters to American Embassy continue with threats to sack Embassy and damage American automobiles. Exhibit B–3(7).

(q) January 11, 1971, Secretary of State advises American Embassy, Moscow, of State Department protest of Soviet harassment of Americans in Moscow. Exhibit B–3(8). On January 12, 1971, American Embassy reports to Secretary of State on American protest to Soviet Government for acts of vandalism which reveal "unmistakable signs of retaliation." Exhibit B–3(10).

(r) January 12, 1971, USUN to Secretary of State regarding news report that JDL leader Kahane is forming teams to "follow, question and harass" Soviet diplomats in New York City. SMUN official complained to USUN officials of Kahane's latest threat. Exhibit B–3(9).

(s) January 14, 1971, USUN advises Secretary of State of receipt of protest note from Soviet Mission listing various hostile acts against Soviet institutions by JDL. Exhibit B–3(11).

(t) February 17, 1971, USUN advises Secretary of State of note from SMUN protesting anti-Soviet demonstration by JDL at SMUN and campaign of harassment against Soviet personnel. Exhibit B–3(12).

(u) March 18, 1971, Secretary of State advises American Embassy, Moscow, that Dobrynin lodged a formal protest regarding violation of diplomatic premises in Washington by JDL and of JDL campaign to disrupt normal functioning of Soviet offices by tying up telephone lines. Exhibit B–4(10).

(v) March 24, 1971, Secretary of State advises American Embassy, Mos-

cow, of receipt of protest note by Soviets regarding JDL activities. Exhibit B–3(13).

(w) April 23 and 24, 1971, series of telegrams between Secretary of State and American Embassy and USUN regarding protests from the Soviet Government regarding the bombing of the Amtorg offices on April 22. The Soviet Embassy advised the State Department that the American explosion was the third explosion organized by the league in recent times against Soviet organizations. Exhibit B–4(12). Protest note received by the American Embassy in Moscow refers to the unbridled campaign hostile to the USSR being conducted in the United States by the JDL "which has proclaimed as its goal the creation of intolerable conditions for the work of Soviet establishments in the United States and which is using for this, methods of vandalism and terror. * * * The United States Government is deluding itself if it believes that the Soviet public will not react to the provocative acts of the American Zionists." Exhibits B–5(8) and (9). See also Exhibits B–5(6), B–4(12) and B–3(14). The foregoing are but a few of numerous other telegrams and memoranda during the same period between the same parties and concerning the same subject matter.

12. The surveillances in question were authorized by the Attorney General after a determination was made by him that the activities of the JDL were obviously detrimental to the continued peaceful relations between the United States and the Soviet Union and threatened the President's ability and constitutional authority to conduct the foreign relations of this country.

### Conclusions of Law

■ 1. The electronic surveillances of JDL headquarters in New York City during the month of October, 1970 and from January 5, 1971 to July 1, 1971 were a proper exercise of the President's constitutional authority to conduct the nation's foreign relations and his power to protect the national security.

2. Section 2511(3) of Title 18, United States Code, specifies certain conduct by the President which is outside of the ambit of the prohibitions and penalties set forth in Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2520. The pertinent part of Section 2511(3) provides:

"Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1103; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. * * * The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial, hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power."

3. Congress through Section 2511(3) disclaimed any attempt to legislate either affirmatively or negatively with respect to the national security powers of the President and specifically referred to the authority of the President to conduct electronic surveillance pursuant to his national security powers.

4. The Supreme Court in United States v. United States District Court for the Eastern District of Michigan and the Honorable Damon J. Keith, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) concluded that Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2520, did not apply to national security surveillances by the Executive. Specifically, the Court concluded in its discussion of this provi-

sion that while Section 2511(3) constitutes ". . . an implicit recognition that the President does have certain powers in the specified areas" (407 U.S. at 303, 92 S.Ct. at 2130) * * * "[w]e . . . think the conclusion inescapable that Congress only intended to make clear that the Act (18 U.S.C. §§ 2510–2520) simply did not legislate with respect to national security surveillances." *Id.* at 306, 92 S.Ct. at 2131.

■ 5. It is concluded therefore that 18 U.S.C. §§ 2510–2520 has no application and cannot be invoked with respect to electronic surveillances conducted pursuant to the President's national security powers. Plaintiffs' complaint and claim for damages pursuant to 18 U.S.C. § 2520 have no basis in the statute relied upon.

6. In deciding the issue of lawfulness of the surveillance in question, it is noted that the Supreme Court in *Keith* expressly reserved the question as to the scope of the President's surveillance power with respect to the foreign aspects of a national security surveillance. The Supreme Court in *Keith* said:

"It is important at the outset to emphasize the limited nature of the question before the Court . . . [T]he instant case requires no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without the country . . . [for] there is no evidence [in this case] of any involvement, directly or indirectly, of a foreign power.[8]

"[8.] Section 2511(3) refers to 'the constitutional power of the President' in two types of situations: (i) where necessary to protect against attack, other hostile acts or intelligence activities of a 'foreign power'; or (ii) where necessary to protect against the overthrow of the Government or other clear and present danger to the structure or existence of the Government. Although both of the specified situations are sometimes referred to as 'national security' threats, the term 'national security' is used only in the first sentence of § 2511(3) with respect to the activities of foreign powers. *This case*

involves only the second sentence of *§ 2511(3), with the threat emanating— according to the Attorney General's affidavit—from 'domestic organizations.'* Although we attempt no precise definition, we use the term 'domestic organization' in this opinion to mean a group or organization (whether formally or informally constituted) composed of citizens of the United States and which has no significant connection with a foreign power, its agents or agencies. No doubt there are cases where it will be difficult to distinguish between 'domestic' and 'foreign' unlawful activities directed against the Government of the United States where there is collaboration in varying degrees between domestic groups or organizations and agents or agencies of foreign powers. *But this is not such a case.*" 407 U.S. at 308–309, 92 S.Ct. at 2132. (Emphasis supplied.)

And, in its conclusion, the Court reiterated the scope of its decision by stating that:

"We emphasize, before concluding this opinion, the scope of our decision. As stated at the outset, this case involves only the domestic aspects of national security. We have not addressed, and express no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents." 407 U.S. at 321–322, 92 S.Ct. at 2139.

■■ 7. The activities of the JDL posed a threat to the continuance of our peaceful foreign relations with the Soviet Union and subjected American citizens living in Moscow to harm by retaliation. Under the facts of this case, which show a clear threat to this country's foreign relations, it is the executive and not the judiciary, which should determine whether or not an electronic surveillance requires prior judicial authorization.

■ 8. No prior authorization from a Court is necessary where, as in this case, electronic surveillances relate to the foreign aspects of our national security. The *Keith* case, dealing only with the domestic aspects of our national security, is clearly distinguishable. *Keith,*

**944**

*supra,* 407 U.S. 297, 321–322, 92 S.Ct. 2125, 32 L.Ed.2d 752.

9. It is within the constitutional power of the President acting through the Attorney General to gather intelligence by authorizing electronic surveillance relating to foreign affairs and deemed essential to protect this nation and its citizens against hostile acts of a foreign power.

10. The electronic surveillances were installed in this case under the constitutional authority of the President over the conduct of foreign relations and his inherent power to protect our national security. Based on the facts of this case the surveillances, without prior judicial authorization, were reasonable within the meaning of the Fourth Amendment and were therefore lawful.

11. In view of the foregoing conclusion of lawfulness of the acts complained of, the remaining defenses asserted by the defendants of executive and sovereign immunity are not reached.

An order consistent with the foregoing has been entered this day.