Bertram ZWEIBON, et al., Appellants,

v.

John N. MITCHELL, individually and as Attorney General of the United States, et al.

No. 82–1626.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 22, 1982.

Decided Oct. 21, 1983.

---

Nathan Lewin, Washington, D.C., with whom Jamie S. Gorelick, Washington, D.C., was on the brief, for appellants.

Larry Lee Gregg, Atty., Dept. of Justice, Washington, D.C., with whom Stanley S. Harris, U.S. Atty., and Barbara L. Herwig, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before EDWARDS, Circuit Judge, MacKINNON, Senior Circuit Judge, and SWYGERT,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

Dissenting opinion filed by Senior Circuit Judge SWYGERT.

MacKINNON, Senior Circuit Judge:

This is our fourth foray into this protracted litigation. Past history notwithstanding, this decision should dispose of the matter.

Appellants, members of the Jewish Defense League (JDL), brought this action in 1971 against John N. Mitchell,[1] who as Attorney General authorized warrantless electronic surveillance of the JDL during 1970 and 1971. Appellants now challenge the district court's order, entered after our third remand, which dismissed their complaint pursuant to Fed.R.Civ.P. 37(b) for their refusal to comply with deposition notices. Because we find that Mitchell is entitled to qualified immunity under the Supreme Court's recent decision in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), we affirm the decision of the district court without reaching the question whether dismissal was an appropriate sanction.

## I. FACTUAL BACKGROUND

The facts of this case need only be sketched here, as they are set out in exhaustive detail in our opinion in *Zweibon v. Mitchell (Zweibon I),* 516 F.2d at 594 (D.C. Cir.1975) (en banc), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976). In 1970 and 1971, the telephones of the JDL

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Nine special agents of the Federal Bureau of Investigation were also named as defendants, but they were dismissed from the case in earlier proceedings and are not parties to this appeal. *See* Record of Status Call at 3 (Dec. 1, 1981) (IV App. 68). [References to the Joint Appendix filed with the briefs in this appeal are designated as "IV App." to distinguish that volume from appendices, also referred to herein (*e.g.,* "III App."), which were filed on previous appeals in this case.] For clarity, we refer to Mitchell throughout this opinion as the sole defendant to this action.

were tapped by the FBI, which acted without a warrant under a specific directive from Mitchell.[2] Mitchell, in turn, had responded to official requests for such authorization from J. Edgar Hoover, who adverted to Soviet complaints about sometimes violent JDL demonstrations against Soviet personnel and installations in New York.[3] Electronic surveillance was sought in order to forestall deterioration in American-Soviet relations and to avoid threatened retaliation against American citizens in Russia. *See id.* at 608–09 & nn. 20–23; *Zweibon v. Mitchell,* 363 F.Supp. 936, 939–42 (D.D.C. 1973). Against the advice of his legal counselors,[4] Mitchell authorized the warrantless taps on September 15, 1970.[5]

The first wiretap was in place during the month of October 1970. *Zweibon I,* 516 F.2d at 609. The volume of JDL protests increased during the last two months of 1970; and on January 4, 1971, Mitchell approved an official FBI request for authority to reinstitute surveillance for a period of 90 days. *Id.* at 609–10. Authority was extended for another 90 days on March 31, 1971. *See* Memorandum from J. Edgar Hoover to the Attorney General (Mar. 31, 1971) (III App. 72).

On May 12, 1971, indictments were returned against a number of JDL members—including five of the appellants in this action—on federal charges under the Gun Control Act of 1968.[6] Prosecutors disclosed the existence of the taps on June 18, 1971, during pretrial proceedings in two consolidated criminal cases stemming from the indictments.[7] In apparent violation of Mitchell's own directive against overhearing conversations of a federal criminal defendant or his attorney,[8] the taps continued after indictment and even after their disclosure by the prosecution.[9] There is, however, no evidence to suggest that Mitchell knew surveillance had not been terminated upon indictment as he had previously directed.[10] *See Zweibon I,* 516 F.2d at 610–11 & n. 34.

**2.** A preexisting Presidential directive expressly delegated to the Attorney General responsibility and authority for exercising the President's putative authority to approve warrantless electronic surveillance in national security cases. *See* President Johnson's Memorandum for the Heads of Executive Departments and Agencies (June 30, 1965), *reproduced at Zweibon I,* 516 F.2d at 674–75, app. A.

**3.** Hoover's memorandum is discussed in our opinion in *Zweibon I,* 516 F.2d at 609 n. 24.

**4.** *See* Memorandum from Assistant Attorney General J. Walter Yeagley, Internal Security Division, to the Attorney General at 4–5 (Apr. 1, 1969) (IV App. 20–21); Memorandum from the Solicitor General to the Attorney General at 7–8 (Apr. 3, 1969) (IV App. 28–29); Memorandum from the Solicitor General to the Attorney General at 2–5 (Apr. 7, 1969) (IV App. 35–38). *But see* Memorandum from Assistant Attorney General Will Wilson, Criminal Division, to the Attorney General at 1 (Apr. 15, 1969) (IV App. 40) (urging, without legal analysis, that "wiretaps involving . . . dangerous and violent internal subversion" be defended as constitutional).

**5.** Mitchell's signed approval, dated September 15, 1970, was affixed to the bottom of Hoover's memorandum requesting the authorization. Memorandum from J. Edgar Hoover to the Attorney General at 2 (Sept. 14, 1969) (III App. 69).

**6.** Pub.L. No. 90–618, 82 Stat. 1213 (1968) (codified at scattered sections of Titles 18 and 26 U.S.C.).

**7.** These criminal cases are *United States v. Bieber,* No. 71–CR–479 (E.D.N.Y.), and *United States v. Joffe,* No. 71–CR–480 (E.D.N.Y.). The pretrial hearing is unreported. *Zweibon I,* 516 F.2d at 607 n. 15.

**8.** In a letter dated July 14, 1969, Mitchell had prohibited the overhearing of conversations of a federal criminal defendant or his attorney. *See Zweibon I,* 516 F.2d at 611 & n. 34; Memorandum from J. Edgar Hoover to the Attorney General at 2 (Jan. 4, 1971) (III App. 71). Bertram Zweibon, who is lead plaintiff in this action, was a counsel of record in the criminal proceedings. *Zweibon I,* 516 F.2d at 611 n. 33.

**9.** Indictments were returned on May 12; the taps were revealed on June 18; and the surveillance was terminated on July 3. *See Zweibon I,* 516 F.2d at 605 n. 10, 610 n. 31.

**10.** In fact, Hoover's memorandum seeking the first 90-day authorization concluded with an express assurance that the requested "monitoring [would] be conducted in accordance with the instructions set forth in your letter of July 14, 1969, entitled 'Electronic Surveillances.'" Memorandum from J. Edgar Hoover to the Attorney General at 2 (Jan. 4, 1971) (III App. 71).

## II. Procedural History

Shortly after the surveillance was revealed, appellants filed this action for damages allegedly flowing from the overhearings. The taps were alleged to have violated appellants' rights under both the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1976). The action was promptly stayed pending the Supreme Court's decision in *United States v. United States District Court (Keith)*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). On June 19, 1972, the Supreme Court decided *Keith*, holding that there exists no exception from the warrant requirement for surveillance justified solely on the basis of *domestic* threats to the national security. *Id.* at 321, 92 S.Ct. at 2138. The Court expressly left open, however, "the issues which may be involved with respect to activities of foreign powers or their agents," *id.* at 322, 92 S.Ct. at 2139 (footnote omitted), and it did not articulate precise definitions of "domestic" and "foreign" threats to national security. *See id.* at 309 n. 8, 92 S.Ct. at 2132 n. 8.

A year later, the district court granted Mitchell's motion for summary judgment. 363 F.Supp. 936 (D.D.C.1973). The court distinguished *Keith* as "dealing only with the domestic aspects of our national security," *id.* at 943, and concluded that warrantless surveillance of the JDL was a lawful "exercise of the President's constitutional authority to conduct the nation's foreign relations and his power to protect the national security." *Id.* at 942. The court also ruled that Title III of the Omnibus Crime Control and Safe Streets Act did not address itself to "national security surveillances" that have "foreign aspects." *Id.* at 943.

This court, sitting *en banc,* reversed. *Zweibon I,* 516 F.2d 594 (1975). Although all eight judges found the wiretaps to be illegal, the appeal spawned six separate opinions on the constitutional and statutory issues.[11] We remanded for consideration of affirmative defenses not yet reached by the district court.

On remand appellants filed a demand for a jury trial on the remaining issues. The district court struck the demand (*see* III App. 193), apparently on the ground that it was untimely. *See* Defendants' Motion to Strike Plaintiffs' Demand for Jury Trial (III App. 192). Upon appellants' subsequent petition for mandamus, we concluded that appellants had not waived their right to demand a jury trial on the affirmative defense of good faith immunity. *In re Zweibon (Zweibon II),* 565 F.2d 742 (D.C. Cir.1977) (per curiam).

While the mandamus petition was pending, Mitchell revived his motion for summary judgment. *See* Defendants' Renewed Motion for Summary Judgment (III App. 348). He argued that the decisions in *Keith* and *Zweibon I* should not be given retroactive application to either the statutory or the constitutional claims. The district court agreed and granted his renewed motion for summary judgment. *Zweibon v. Mitchell,* 444 F.Supp. 1296, 1298–1300 (D.D.C.1978).

We again reversed. *Zweibon v. Mitchell (Zweibon III),* 606 F.2d 1172 (D.C.Cir.1979), cert. denied, 453 U.S. 912, 101 S.Ct. 3147, 69

---

Mitchell approved the request by signing immediately below this assertion. *Id.*

11. A plurality of the court joined Judge Wright's opinion, which found violations of both the Fourth Amendment and Title III. *Zweibon I,* 516 F.2d at 604–73 (plurality opinion). Judges McGowan and Robb filed concurring opinions; they found it unnecessary to reach the constitutional questions because they deemed the taps to be violative of Title III. *Id.* at 681–87 (McGowan, J., concurring in the judgment); *id.* at 688–89 (Robb, J., concurring). Judges MacKinnon and Wilkey filed opinions concurring in part and dissenting in part; both

concluded that the JDL surveillance violated appellants' rights under the Fourth Amendment, but rejected the other judges' finding that Title III had also been contravened. *Id.* at 689–706 (Wilkey, J., concurring and dissenting); *id.* at 706–07 (MacKinnon, J., concurring in part and dissenting in part). Finally, while concurring in the plurality's disposition of the statutory and constitutional questions, Judge Bazelon wrote separately to disapprove the court's decision to permit Mitchell to raise certain affirmative defenses on remand. *Id.* at 675–81 (Bazelon, J., concurring in part, dissenting in part).

L.Ed.2d 997 (1981). While agreeing with the district court that our application in *Zweibon I* of Title III to unconstitutional national security surveillance "represented a sharp break in the law which should be restricted to prospective effect," *id.* at 1182, we found that equitable considerations weighed in favor of applying *Keith* and *Zweibon I* retroactively to the constitutional claims. *Id.* at 1177–81. Despite the existence of contradictory lower court rulings, we rejected Mitchell's claim that the outcome in *Keith* and *Zweibon I* was not clearly foreshadowed. *Id.* at 1179. However, we observed that while

> [c]ontradictory lower court rulings might not establish that a decision was not clearly foreshadowed and should not have retroactive effect, ... *such a split of decisions might provide reasonable grounds for taking actions based on one or the other position for official immunity purposes.*

*Id.* at 1181 n. 49 (emphasis added). We explicitly noted that any concerns we might entertain for the fairness of retroactivity in this case were allayed by the potential availability of the good faith immunity defense. *See id.* at 1180–82 & nn. 49–50. Accordingly, we again remanded for consideration of Mitchell's good faith defense.

On the third remand, the district court held a status conference. At that time, counsel for Mitchell was permitted, with the qualified consent of appellants, *see* note 13 *infra,* to proceed with discovery. Record of Status Call, *supra* note 1, at 13 (IV App. 78). Counsel advised that paper and deposition discovery would be sought, with a view to filing a new motion for summary judgment based on an expanded record following the disposition of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), which had just been argued before the Supreme Court.[12] *See* Record of Status Call, *supra* note 1, at 5–8, 12 (IV App. 70–73, 77). In particular, counsel declared his intention to depose all the appellants.[13] *Id.* at 10 (IV App. 75). Counsel for appellants objected to these proposed depositions as burdensome and unnecessary, but the court refused to circumscribe appellee's discovery at that time. *Id.* at 12–13 (IV App. 77–78).

During December 1981, deposition notices, interrogatories, and requests for admissions were served on all appellants. Docket Entries at 6–8 (IV App. 11–13). Appellants responded to the paper discovery but moved for a protective order quashing the notices of deposition. Motion for Protective Order (IV App. 54). Appellants contended that the proposed schedule was too intensive and the information sought by appellee was irrelevant to the remaining issues in the case. *See* Memorandum in Support of Plaintiffs' Motion for Protective Order (IV App. 55–65). Mitchell responded by arguing, *inter alia,* that depositions

---

12. In *Zweibon III,* this court incorporated the opinion issued the same day in *Halperin v. Kissinger,* 606 F.2d 1192, 1208–10 (D.C.Cir. 1979), as a basis for rejecting Mitchell's claim that he was entitled to absolute or qualified immunity as a matter of law. He was left to pursue on remand a qualified immunity defense grounded on subjective and objective criteria. *Zweibon III,* 606 F.2d at 1181. The Supreme Court was unable to resolve the immunity issues in *Halperin,* which was affirmed by an equally divided Court. 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981). Subsequently, writs of certiorari were granted in *Nixon v. Fitzgerald,* 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 969 (1981), and *Harlow v. Fitzgerald,* 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 969 (1981), which presented similar immunity issues.

13. Counsel for Mitchell also announced an intention to depose nonparties in order to corroborate Mitchell's recollection of events surrounding his approvals of the JDL surveillance. Record of Status Call, *supra* note 1, at 8–9 (IV App. 73–74). It was to these depositions that appellants acceded, *id.* at 6 (IV App. 71), but no such depositions were ever noticed. Counsel for Mitchell also described his intention to depose all the appellants as "tentative," depending on the quality of responses he obtained from paper discovery. *Id.* at 10 (IV App. 75). Nonetheless, appellee noticed depositions of all appellants *before* he served them with interrogatories and requests for admissions. *See* Docket Entries at 6–8 (IV App. 11–12). Depositions were noticed for every working day between February 17 and March 17, 1982, a schedule even appellee characterizes as "intensive." Brief for Appellee at 13.

aimed at revealing the "true nature" of appellants' conduct with respect to Soviet installations might be relevant to the objective reasonableness of his decision to authorize the surveillance. *See* Defendant's Opposition to Plaintiffs' Motion for a Protective Order at 5–6 (IV App. 113–14). Mitchell also contended that depositions might elicit evidence relevant to the calculation of damages, as to which he believed appellants' own conduct might be presented to the jury in mitigation of damages or to preclude punitive damages. *Id.* at 6 (IV App. 114).

The district court denied appellants' motion for a protective order. Order of April 23, 1982 (IV App. 123). Appellants promptly filed a motion for reconsideration, in which they offered to *stipulate* that Mitchell could reasonably have believed reports he had received on JDL activities. Plaintiffs' Motion for Reconsideration of Order Denying Motion for Protective Order at 2, 3–4 (IV App. 125, 126–27). Appellants also "respectfully advise[d] the Court that they [would] not comply with defendant's request for these irrelevant depositions." *Id.* at 3 (IV App. 126).

Subsequently, at a hearing on the motion for reconsideration, counsel for appellants offered to make *one* appellant available so that the court could better assess the relevance of such testimony. Transcript of Hearing of April 5, 1982, at 3–5, 16 (IV App. 154–56, 167). Counsel also offered not to seek "special" damages, but declined to limit appellants' claim to one for nominal damages. *Id.* at 4–9 (IV App. 154–60). Appellants reiterated their intention to refuse to comply with notices of deposition. *Id.* at 5 (IV App. 156). The district court an-

nounced from the bench its decision to dismiss the complaint as a sanction pursuant to Fed.R.Civ.P. 37(b) for appellants' refusal to submit to depositions. *Id.* at 19 (IV App. 170). The final judgment and findings of fact and conclusions of law were entered on May 14, 1982. (IV App. 171–76). This appeal followed.

### III. ISSUES ON APPEAL

As previously noted, we find it unnecessary to decide whether the district court should have granted appellants' request for a protective order and, if not, whether dismissal was an appropriate sanction for their refusal to comply with notices of deposition. We find Mitchell entitled to summary judgment as a matter of law on the issue of qualified immunity under principles recently enunciated in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

While the district court has not yet considered this defense, a reviewing court may rest its affirmance on any ground for which the record is sufficient to permit the necessary findings of fact and law. *Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970); *Lew v. Suffridge,* 370 F.2d 487, 488 & n. 1 (D.C.Cir.1966). Appellants do not question the sufficiency of the record as a basis for resolving the defense; indeed, appellants insist that "discovery in this case had been completed before the district court entered summary judgment in 1978." [14] Brief for Appellants at 16. Moreover, the parties have briefed and argued the qualified immunity defense before this court.[15] Given

---

**14.** Even if discovery had not been completed, the record would be sufficient to adjudicate Mitchell's qualified immunity claim. In *Harlow,* the Supreme Court characterized the defense as a "threshold immunity question" before the resolution of which discovery should not be allowed. 102 S.Ct. at 2739.

**15.** Appellants anticipated and addressed the immunity issues in their opening brief—*before* Mitchell had formally raised the issue in his brief on this appeal. Such anticipation was hardly prophetic, given the tenor of the Su-

preme Court's *Harlow* decision and defense counsel's previously stated intention to file a new motion for summary judgment once *Harlow* had been decided. *See* Record of Status Call, *supra* note 1, at 5–8, 12 (IV App. 70–73, 77).

Mitchell also argues that as Attorney General he is entitled to absolute immunity from actions for damages arising out of national security electronic surveillance. *See Harlow v. Fitzgerald, supra,* 102 S.Ct. at 2736 & n. 18 (dictum). We find it unnecessary to reach this issue, since, as we hold below, Mitchell is clear-

the Supreme Court's admonition that insubstantial claims against government officials should not proceed to trial, *Harlow v. Fitzgerald, supra,* 102 S.Ct. at 2727 (citing *Butz v. Economou,* 438 U.S. 478, 507–08, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978)), we would be remiss in our appellate duty were we to order yet another remand to resolve what is a purely legal threshold question. *See, e.g., Hall v. United States,* 704 F.2d 246, 249–51 (6th Cir.1983); *Silverman v. Ballantine,* 694 F.2d 1091, 1096 (7th Cir.1982); *Wolfel v. Sanborn,* 691 F.2d 270, 272 (6th Cir.1982) (per curiam) (Weick, J., dissenting), *cert. denied,* —— U.S. ——, 103 S.Ct. 751, 74 L.Ed.2d 969 (1983).

## A. The Harlow *Standard*

Before *Harlow,* qualified immunity was denied an official who

> knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [complainant] or if [the official] took the action with malicious intention to cause a deprivation of constitutional rights or other injury.

*Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975). The old test thus had objective and subjective elements: immunity was available only if the official had neither violated clearly established law nor acted out of malice. *See, e.g., Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). Aware that denying absolute immunity to officials might subject them to harassing civil litigation, the Court admonished judges quickly to weed out frivolous claims through firm application of the Federal Rules of Civil Procedure. *Butz v. Economou, supra,* 438 U.S. at 507–08, 98 S.Ct. at 2911; *see Hanrahan v. Hampton,* 446 U.S. 754, 765, 100 S.Ct. 1987, 1993, 64 L.Ed.2d 670 (1980) (Powell, J., concurring in part and dissenting in part).

The Court discovered, however, that questions of subjective intent are rarely amenable to resolution on motions for summary judgment and that the broad-ranging discovery which resulted could often be disruptive of effective government. *Harlow v. Fitzgerald, supra,* 102 S.Ct. at 2737. Accordingly, the Court in *Harlow* made an "adjustment" of the standard for qualified immunity by severing the subjective element from the defense. *Id.* at 2737–39. Concluding that "bare allegations of malice" should not be sufficient to subject officials to the burdens of trial and discovery, the Court held that government officials

> generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 2737 (citing *Procunier v. Navarette, supra,* 434 U.S. at 565, 98 S.Ct. at 861; *Wood v. Strickland, supra,* 420 U.S. at 321, 95 S.Ct. at 1000). Thus, once the trial judge determines that the law was not clearly established at the time the contested conduct occurred, the inquiry ceases. *Id.* 102 S.Ct. at 2738–39. At that point the official is entitled to summary judgment as a matter of law, and "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." *Id.* at 2739.

## B. *The Test Applied*

■ Our task after *Harlow,* therefore, is to measure Mitchell's conduct by reference to clearly established law at the time these wiretaps were authorized. The precise con-

ly entitled to qualified immunity. We deem it prudent to defer the question until we are faced with a situation in which an Attorney General has trampled on unquestioned constitutional or statutory rights in the name of "national security." The careful balancing of competing values that inhere in immunity analysis—the public interest in encouraging the vigorous exercise of official authority and the importance of a damages remedy for the vindication of constitutional guarantees, *id.* at 2733; *Butz v. Economou, supra,* 438 U.S. at 504–06, 98 S.Ct. at 2909–10—should not be attempted until the accommodation of those values can be tested in a concrete factual setting. We decline, therefore, the invitation to reach out and resolve in dicta this important and difficult question.

tours of what constitutes "clearly established law" for immunity purposes are difficult to delimit, and the Supreme Court has offered little guidance in this regard. *See id.* at 2738 n. 32 ("As in *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978), we need not define here the circumstances under which 'the state of the law' should be 'evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the Local District Court.' "). We too are spared that Herculean labor, since we conclude that the illegality of Mitchell's conduct was not "clearly established" by any reasonable definition of the phrase.

As noted above, *see* page 164 *supra,* the Supreme Court issued no pronouncement on the legality of warrantless domestic national security surveillance until a year *after* the JDL wiretaps had been terminated. Even then, in declaring such searches illegal, the Court declined to articulate a crisp distinction between "foreign" and "domestic" threats to national security. *See Keith, supra,* 407 U.S. at 309 n. 8, 92 S.Ct. at 2132 n. 8. It is not surprising, therefore, that the district court should have reached one conclusion as to the legality of the JDL taps and that this court should have expended six separate opinions and over one hundred pages of analysis to reverse that conclusion. As appellee points out, a reading of *Zweibon I* alone "bel[ies] any suggestion that the Court was confronted with a simple issue automatically controlled by earlier decisions." Brief for Appellee at 61. Indeed, we observed in *Zweibon I* that this case "involve[s] the foreign affairs of this country and therefore falls outside the holding in *Keith* and into the area it reserved for further disposition." 516 F.2d at 652; *see Keith, supra,* 407 U.S. at 309 n. 8, 321–22, 92 S.Ct. at 2132 n. 8, 2138–39.

Moreover, we recently had occasion in *Sinclair v. Kleindienst,* 645 F.2d 1080 (D.C. Cir.1981), to consider whether factually similar warrantless surveillances violated clearly established law. *Sinclair* involved alleged constitutional violations stemming, in part, from the very surveillance which culminated in the *Keith* decision. The FBI had maintained wiretaps on the Black Panther and White Panther parties between February 1969 and January 1971. *Id.* at 1081. As in the present case, the government unsuccessfully asserted that warrants were unnecessary because the taps were aimed at collecting information necessary to protect the nation's internal security. After the *Keith* Court spurned that assertion, plaintiffs brought an action for damages against Mitchell and other officials. The district court granted summary judgment in favor of Mitchell on the issue of qualified immunity. *Id.* at 1082–83.

We affirmed the decision regarding immunity. *Id.* at 1084–85. Observing that the Supreme Court had expressly reserved ruling on the legality of warrantless national security surveillances in *Katz v. United States,* 389 U.S. 347, 358 n. 23, 88 S.Ct. 507, 515 n. 23, 19 L.Ed.2d 576 (1967), we noted that the only federal courts that had addressed the issue at the time the wiretaps were in place had concluded that warrants were unnecessary. *Sinclair v. Kleindienst, supra,* 645 F.2d at 1084 (citing *United States v. Stone,* 305 F.Supp. 75 (D.D.C. 1969); *United States v. O'Baugh,* 304 F.Supp. 767 (D.D.C.1969)). As a result, we held that for purposes of qualified immunity Mitchell had entertained a reasonable belief in the legality of his conduct. *Sinclair v. Kleindienst, supra,* 645 F.2d at 1084–85 (citing *Chagnon v. Bell,* 642 F.2d 1248, 1258 (D.C.Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981)).

Our decision in *Sinclair* controls the disposition of this appeal. If there was no clearly established warrant requirement as of January 1971 (the date of the last surveillance in *Sinclair*), it follows that there was no such requirement as of March 31, 1971 (the date Mitchell authorized the last series of JDL surveillances), or even as late as July 3, 1971 (the date the surveillance was finally terminated). *See* note 9 *supra.*

We also acknowledged in *Sinclair* that there "was no judicially imposed reasona-

bleness requirement for national security wiretaps at the time," *id.* at 1082, and that the minimization procedures Mitchell himself had prescribed, *see* note 8 *supra,* "predated any judicial requirement for them in national security surveillance." 645 F.2d at 1085. Similarly, in *Chagnon v. Bell, supra,* we noted that even in its 1972 *Keith* opinion the Supreme Court had "declined to delineate 'precise standards for domestic security warrants' " and instead had invited Congress to articulate them. 642 F.2d at 1262 (quoting *Keith, supra,* 407 U.S. at 323, 92 S.Ct. at 2139). It is plain, therefore, that there existed no clearly established warrant or reasonableness requirements at the time Mitchell authorized the JDL surveillance.

Undaunted, appellants proffer three "critical" bases for distinguishing *Sinclair*—a decision they do not even deign to cite in their opening brief. None of the bases is "critical."

First, appellants maintain that, even if it had been reasonable to conclude in 1970 that no warrant was required to eavesdrop on the Black Panther Party—which threatened violent overthrow of the government and maintained some contact with foreign governments—it was not similarly reasonable to conclude that it was lawful to conduct warrantless surveillance of the JDL—a domestic group "which posed no threat to our own government and did not act in concert with a foreign power." Appellants' Reply Brief at 13. That such a slender distinction is not "critical" seems self-evident, especially in light of the complex arguments and sharp differences of opinion that characterized our various analyses of the Fourth Amendment claims in *Zweibon I. See* note 11 *supra.* Even in *Keith,* the Supreme Court declined to elaborate on the incidents of "foreign" versus "domestic" surveillances. 407 U.S. at 309 n. 8, 92 S.Ct. at 2132 n. 8. Consequently, we refused to follow precisely this route in *Zweibon I:*

> Although appellants contend and appellees admit that the JDL is a domestic organization with no Russian connection, *that fact does not mean that appellants are correct in their assertion that the warrantless surveillance here is automatically unlawful.* In *Keith,* "[t]here was no evidence of any involvement, directly or indirectly, of a foreign power." Here, by contrast, while there is no collaboration between the JDL and Russia—quite the reverse—JDL's activities did involve Russia in a confrontation with the United States. Thus this case does indeed involve the foreign affairs of this country and therefore falls outside the holding in *Keith* and into the area it reserved for future disposition. Although the type of involvement here was not anticipated in *Keith,* there is no indication that *Keith* intended to limit "involvement" to collaboration with a foreign power. Collaboration simply was the most obvious example of how a domestic organization could become involved in the foreign affairs of this country.[189]

> ---
> [189] *See* 407 U.S. at 309 n. 8, 92 S.Ct. 2125 [at 2132 n. 8]. For example, if the defendant in *Keith* had been financed by a foreign power, the Court would have treated the case as involving the foreign aspects of our national security even though the foreign power had itself taken no overt action against this country. *In our case, since the threat to national security emanated from Russia, there is no question that the President's foreign affairs powers must be considered in our decision whether the surveillance was lawful.*

516 F.2d at 652 & n. 189 (footnotes omitted) (emphasis added). A public official should not be made to guess, at his peril, whether distinctions as rarefied as those appellants proffer might one day subject him to personal liability for his official acts. Such a crabbed immunity defense "would dampen the ardor of all but the most resolute." *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950) (L. Hand, J.).

Second, appellants contend that contemporaneous internal Department of Justice memoranda written for Mitchell demonstrate that such distinctions were "understood by advisors to this defendant." Appellants' Reply Brief at 13; *see* note 4 *su-*

*pra.* The short answer to this argument is that it is irrelevant after *Harlow.* It goes only to Mitchell's subjective good faith, an element now shorn from the defense of qualified immunity. *See Harlow v. Fitzgerald, supra,* 102 S.Ct. at 2738 (limits of qualified immunity defined "essentially in objective terms"). Furthermore, because "discovery should not be allowed" until the "threshold immunity question is resolved," *id.,* we are reticent to allow appellants to benefit from the fruits of discovery that took place before *Harlow* was decided.[16] Finally, our reading of the internal memoranda discloses that they make predictions as to future action by the Supreme Court and discuss strategic considerations for potential litigation; the memoranda do not purport to declare what was then legally permissible conduct with respect to warrantless national security surveillance.

Third, appellants would distinguish *Sinclair* on the ground that, by the time Mitchell renewed his second wiretap authorization in this case, two lower courts had found warrantless wiretaps to be improper when directed at domestic groups. Appellant's Reply Brief at 13; *see* Brief for Appellant at 36; *accord Forsyth v. Kleindienst,* 551 F.Supp. 1247, 1255 (E.D.Pa. 1982), *proceedings stayed pending appeal,* 700 F.2d 104 (3d Cir.1983). It is true that two district courts had so ruled less than three months before Mitchell's March 3, 1971 authorization. *See United States v.*

*Sinclair,* 321 F.Supp. 1074 (E.D.Mich.1971); *United States v. Smith,* 321 F.Supp. 424 (C.D.Cal. Jan. 8, 1971). We allow to pass unremarked the exiguous amount of time—roughly two-and-a-half months—appellants apparently would vouchsafe the Attorney General in which to evaluate, assimilate, and apply in a systematic fashion isolated lower court decisions that might bear on the Department's day-to-day operations.[17]

Moreover, these two decisions were not the only lower court decisions dealing with the putative national security exemption from the warrant requirement; they were merely the first cases to exclude surveillance of domestic organizations from the scope of that exemption. Mitchell could reasonably have relied on *other* lower court decisions in which warrantless national security surveillances were held permissible. *See, e.g., United States v. Butenko,* 318 F.Supp. 66 (D.N.J.1970), *aff'd,* 494 F.2d 593 (3d Cir.), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974); *United States v. Brown,* 317 F.Supp. 531 (E.D.La.1970), *appeal dismissed,* 456 F.2d 1112 (5th Cir.1972) (per curiam), *aff'd,* 484 F.2d 418 (5th Cir. 1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974); *United States v. Dellinger,* No. 69 Cr. 180 (N.D.Ill.1970) (III App. 356); *United States v. O'Neal,* Cr. No. KC Cr. 1204 (D.Kan.1970); *United States v. Clay,* Cr. No. 6711–94 (S.D.Tex. 1969), *aff'd,* 430 F.2d 165 (5th Cir.), *rev'd on*

**16.** We would not have our opinion read to excuse the extraordinarily sly violator "who *actually knows* that he was violating the law ..., even if he could not 'reasonably have been expected' to know what he actually did know." *Harlow v. Fitzgerald, supra,* 102 S.Ct. at 2740 (Brennan, J., concurring) (emphasis in original). The Court's *Harlow* opinion appears to have been carefully crafted to avoid such an egregious, if doubtless rare, result. *See id.* at 2737 ("*bare allegations* should not suffice") (emphasis added); *id.* ("We therefore hold that government officials ... *generally* are shielded from liability ... insofar as their conduct does not violate clearly established statutory or constitutional rights ...."") (emphasis added). We merely conclude that, whatever the wisdom of disregarding the advice of some

of his advisors, Mitchell did not "actually know" that his conduct was illegal and that the memoranda cannot otherwise support an inference that his belief was *objectively* unreasonable.

**17.** We find it odd that appellants would charge Mitchell with a duty to apply, at his peril, a couple of lower court decisions to an ongoing surveillance while appellants themselves seek to impugn his reliance on *United States v. O'Neal,* Cr. No. KC Cr. 1204 (D.Kan.1970), and *United States v. Butenko,* 318 F.Supp. 66 (D.N. J.1970), on the ground that they "were decided after the initial wiretap authorizations." Brief for Appellants at 35.

*other grounds,* 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971).

Appellants rejoin that Mitchell should have distinguished all these cases. Thus, they suggest that *Dellinger* and *O'Neal* might have been distinguished on the ground that the criminal defendants in those cases were allegedly seeking the overthrow of the government. Brief for Appellant at 35–36. But neither the disclaiming footnote in *Katz,* nor Justice White's celebrated concurring opinion therein, purported to confine the open question to surveillances aimed only at efforts to overthrow the government. *See* 389 U.S. at 358 n. 23, 88 S.Ct. at 515 n. 23; *id.* at 363–64, 88 S.Ct. at 517–18 (White, J., concurring). Nor did *Katz* suggest that a "national security" exemption might excuse warrantless surveillance directed at foreign embassies (*Clay, Brown*) or at individuals allegedly engaged in foreign espionage (*Butenko*), but not surveillance aimed, as in the present case, at meeting threats to our foreign relations or to American diplomatic personnel abroad. We reiterate that even in *Keith* the Supreme Court did not draw the nice distinctions upon which appellants argue the personal liability of an Attorney General should turn.

Perhaps anticipating that efforts to distinguish *Sinclair v. Kleindienst* would be unpersuasive, appellants assail, without citing, the holding of *Sinclair* itself. To this end, appellants maintain that the "clearly established" test for immunity purposes is coterminous with the "clearly foreshadowed" test courts employ to determine whether a judicial decision ought to be given retroactive effect. *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Accordingly, appellants conclude that our decision in *Zweibon III* giving retroactive effect to *Keith* and *Zweibon I* disposes of the immunity defense now that *Harlow* bars inquiry into subjective intent. Brief for Appellants at 24–27. In addition, by gathering scattered dicta from *Katz, Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), and *Giordano v. United States,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), appellants

"poll" the Supreme Court Justices on the scope of the national security exemption as of 1970. Appellants come up with six Justices (including Justice Fortas) who had indicated their agreement with the proposition *Keith* eventually would establish. As a result, appellants conclude, the unlawfulness of the JDL surveillance was "clearly established" by prior decisions. *See* Brief for Appellants at 32–34.

Even ignoring the inherent difficulties and imprecision that must attend any "vote" based on statements made in other decisional contexts, appellants' "poll" proves nothing, since it applies a different test from that expounded in *Harlow.* The test for qualified immunity is "clearly established," not "clearly foreshadowed." The distinction is self-evident.

Appellants' attempt to pass off the two standards as coterminous receives no support from *Harlow* itself. Nowhere does the Court employ the phrase "clearly foreshadowed"; nor does the Court suggest that its standard bears any relationship to that for retroactivity. To the contrary, immediately after stating its new holding that officials are immune insofar as their conduct does not violate clearly established law, the Court makes clear that the *content* of the standard is identical to that for establishing the "objective" element of the old two-pronged test for qualified immunity. *See* 102 S.Ct. at 2737 (citing *Procunier v. Navarette, supra,* 434 U.S. at 565, 98 S.Ct. at 861; *Wood v. Strickland, supra,* 420 U.S. at 321, 95 S.Ct. at 1000). Appellants concede that the *Harlow* test "remained . . . the same as had been defined in *Wood v. Strickland.*" Brief for Appellants at 25. The concession is telling, for the very pages in *Wood* to which appellants and the *Harlow* Court—direct us describe the objective standard as follows:

> [A]n act violating . . . constitutional rights can be no more justified by ignorance or disregard of *settled, indisputable law* . . . than by the presence of actual malice.

[A school board member] must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the *basic, unquestioned constitutional rights* of his charges.

*Wood v. Strickland, supra,* 420 U.S. at 321, 322, 95 S.Ct. at 1000 (emphasis added). It is evident that language which speaks of "indisputable law" and "unquestioned rights" cannot be reconciled with the "clearly foreshadowed" test.

Moreover, our decision in *Zweibon III* evinces a clear understanding of the differences between the tests for retroactivity and immunity. In fact, we invoked those differences to allay any lingering concerns over the fairness of retroactivity:

> Our rejection of the claim that *Keith* and *Zweibon I* should only be applied prospectively because they were not clearly foreshadowed ... should not be seen to undercut a claim of reasonable grounds for believing the legality of one's actions on the immunity issues. Contradictory lower court rulings might not establish that a decision was not clearly foreshadowed and should not have retroactive effect, but such a split of decisions might provide reasonable grounds for taking actions based on one or the other position for official immunity purposes.

*Zweibon III,* 606 F.2d at 1181 n. 49. *See also id.* at 1181 n. 50 ("[W]e believe that

because qualified immunity protects potential defendants acting in good faith and in accordance with a reasonable understanding of applicable law, equitable considerations favor retroactivity to provide compensation for constitutional injury."). The two tests, therefore, are not coterminous.

We are not unmindful of the consequences that might attend a too niggardly definition of what constitutes "clearly established" law. Attorneys General are lawyers, after all—often good ones—and every first-year law student learns how to distinguish cases which on first blush seem squarely on point. But the distinctions between Mitchell's conduct here and that condemned in *Katz* or even *Keith* are real and substantial. Mitchell could reasonably have relied on those distinctions in authorizing the JDL wiretaps. Nothing in our opinion today should be read to suggest that impermissible conduct may be excused by the drawing of trivial factual distinctions.

## IV. CONCLUSION

Having carefully considered the record and all of appellants' arguments,[18] we find that Mitchell is entitled to summary judgment as a matter of law on the question of qualified immunity. Therefore, the decision of the district court is affirmed.[19]

*Judgment accordingly.*

---

**18.** Two other issues raised by appellants may be disposed of in cursory fashion. First, appellants contend that if the JDL wiretaps constitute "a 'good faith' surveillance undertaken primarily for *prosecutorial* purposes, then [appellee] violated 'clearly established' law." Brief for Appellants at 56 (emphasis in original). We dismissed this argument in *Chagnon v. Bell,* concluding that there exist no clear standards for defining or evaluating the "purpose" of a warrantless national security wiretap. Consequently, allegations of prosecutorial purpose raise no genuine issues relevant to the defense of qualified immunity. 642 F.2d at 1262 n. 25.

Second, appellants argue that, even if Mitchell violated no clearly established rights under the Fourth Amendment, appellants' clearly established *Sixth* Amendment rights were violated when the taps remained in place after a number of appellants had been indicted on criminal charges. *See* pages 163–164 & notes 8–9 *supra.* Unfortunately, appellants can ad-

vert to no evidence whatsoever that might indicate that Mitchell was aware that the surveillance had not been terminated upon indictment in accordance with the instructions he had previously issued. *Zweibon I,* 516 F.2d at 610–11 ("Mr. Mitchell was unaware that the taps continued for more than a month after criminal indictments were handed down against several individuals (five of whom are plaintiffs in this case) whose conversations, including those with their attorney, were overheard in violation of Justice Department regulations.") (footnotes omitted); *see* pages 163–164 & note 10 *supra.*

**19.** The dissent contends that the decision in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), "clearly established" that presidentially authorized wiretaps were illegal, and that the Court's explicit reservation regarding "situation[s] involving the national security," *id.* at 358 n. 23, 88 S.Ct. at 515 n. 23, was merely a hint that the Court might

SWYGERT, Senior Circuit Judge, dissenting:

I would reverse the district court's dismissal and direct entry of judgment for the plaintiffs. The issue is whether John N. Mitchell, under whose direction the FBI installed warrantless electronic wiretaps in the Jewish Defense League headquarters between October 1970 and July 3, 1971, is entitled to immunity from liability for his violation of plaintiffs' right to be free from unreasonable searches and seizures. There is no question that Mitchell violated those rights. *Zweibon v. Mitchell,* 516 F.2d 594 (D.C.Cir.1975) *(en banc) (Zweibon I), cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976). The only question is whether the constitutional prohibition of warrantless eavesdropping in these circumstances was "clearly established" at the time the wiretaps were ordered, under the standard established by *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Court there held

that Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738.

Mitchell has not met his burden of establishing an immunity defense under the *Harlow* standard. At the time Mitchell ordered the warrantless wiretaps at issue, *United States v. Katz,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), had established

that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few exceptions.

*Id.* at 357, 88 S.Ct. at 514 (footnotes omitted).

Because the Supreme Court had expressly reserved ruling on national security wiretaps in *Katz,* the majority concludes that no clearly established warrant or reasonableness requirements existed at the time Mitchell authorized the surveillance. Although *Katz* did not expressly decide whether the requirements of the fourth amendment could be satisfied in a situation involving the national security if "safeguards" short of a magistrate's authorization were provided, *id.* at 358 n. 23, 88 S.Ct. at 515 n. 23; *see also id.* at 364, 88 S.Ct. at 518 (White, J., concurring), the majority's reliance on these reservations ignores the Court's broad holding that long-established

choose to "create" an exception "in the future." *See infra* at 175. This reading of *Katz* must be rejected. Wiretaps, in national security situations, were authorized by presidents as early as 1915. The practice became well-established during the administration of President Franklin D. Roosevelt, and was continued by each succeeding administration. See the history of presidentially authorized wiretapping set forth in *United States v. Barker,* 514 F.2d 208, 243 nn. 14 & 16, 246–48 (D.C.Cir.1975) (MacKinnon, J., dissenting). The Supreme Court recently stated that while a practice "in violation of the Constitution" does not become constitutional "by long use," nevertheless "an unbroken practice ... is not something to be lightly cast aside." *Marsh v. Chambers,* —— U.S. —— at ——, 103 S.Ct. 3330 at 3335, 77 L.Ed.2d 1019 (1983) *(quoting Walz v. Tax Commission,* 397 U.S. 664, 678, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970)). A governmental practice established by specific written presidential orders effective continuously for over 40 years

must be recognized as being clearly established. And *Katz* also specifically recognized that the constitutional restriction on searches conducted outside the judicial process was "subject ... to a few ... exceptions." 389 U.S. at 357, 88 S.Ct. at 514. In view of this long-standing and continuous practice, the Court's explicit reservation in *Katz* makes it clear that the Court was referring to existing "exceptions," not, as the dissent asserts, simply speculating about whether it would "create" an exception at some future date.

The dissent also asserts that it is Mitchell's burden to prove that the law was *established* in his favor at the time he acted. This is not consistent with *Harlow.* It was only necessary for the Attorney General to show that the law was unsettled (as the conflicting district court cases and this court's struggles with the issue in *Zweibon I* amply demonstrate), *not,* as the dissent suggests, that a Supreme Court opinion had specifically approved the Attorney General's actions.

fourth amendment protections apply to electronic surveillance, as to other forms of intrusions, subject only to well-defined exceptions such as searches incident to arrest, searches made in hot pursuit, and searches subject to consent. *Katz* established no exception to this general rule of fourth amendment applicability for situations involving national security; indeed, the Court emphasized that "[i]t is difficult to imagine how any of those [established] exceptions could apply to the sort of search and seizure involved in this case." *Id.* at 357, 88 S.Ct. at 514. The Court's footnote and Justice White's comment did not create a national security exception, but rather declined to state whether such an exception might be created in the future. It was the exception, rather than the rule, that was not clearly established in 1970–1971. The majority's analysis anomalously transforms the lack of an exception into the lack of a rule.

Subsequent cases demonstrate the presumptive breadth of the *Katz* rule. In *United States v. United States District Court,* 407 U.S. 297, 314–21, 92 S.Ct. 2125, 2135–38, 32 L.Ed.2d 752 (1972) (*Keith*), the Supreme court, relying on the general language of *Katz,* held that judicial approval was required prior to electronic surveillance in domestic national security cases. Similarly, in *Zweibon I, supra,* a plurality of this court noted that *Katz* stated a broad and general rule "that warrantless electronic surveillance conducted through non-trespassory methods is an unreasonable search and seizure within the meaning of the Fourth Amendment." 516 F.2d at 611. Finally, in *Zweibon v. Mitchell,* 606 F.2d 1172, 1179 (D.C.Cir.1979) (*Zweibon III*), this court held "that *Keith* and *Zweibon I* . . . did not announce a new principle of law, but simply applied the constitutional warrant requirement to national security situations."

The majority's reasoning that the lack of a specific ruling that warrantless electronic surveillance was constitutionally proscribed in national security situations left Mitchell no clearly established guidelines is skewed. In my view, the unquestioned constitutional right that was violated in this case is the right, *reaffirmed* by *Katz* in 1967, to be free from unreasonable searches and seizures. *Katz* did not *extend* fourth amendment protections, but rather concluded that no exception exempted electronic eavesdropping from the coverage of those protections. In the same sense, *Keith* did not *extend* fourth amendment protection to domestic organizations. *See Keith,* 407 U.S. at 320, 92 S.Ct. at 2138 ("We do not think a case has been made for the requested *departure* from Fourth Amendment standards."). Because the fourth amendment warrant requirement is presumed to apply unless a clear exception excuses compliance, and because no exception for national security cases was established when Mitchell acted, the law to which he was subject was "clearly established." Under the majority's reverse reasoning, "clearly established statutory or constitutional rights" would be fact-bound, circumscribed by the particular circumstances of prior litigated cases, rather than by the principles by which those cases were decided.

Mitchell chose to ignore the principle on which *Katz* turned, apparently gambling that later Supreme Court decisions might limit the universality of *Katz* by establishing exceptions in national security situations. Under the *Harlow* standard, however, government officials who depart from "settled, indisputable law" in the hope that an exception will later be created justifying their conduct do so at their peril.*

---

* The majority finds it "odd that appellants would charge Mitchell with a duty to apply, *at his peril,*" *see ante* at 171, n. 17 (emphasis added), two district court decisions finding warrantless wiretaps unconstitutional when directed at domestic groups. "Application" of *United States v. Smith,* 321 F.Supp. 424 (C.D. Cal.1971), or *United States v. Sinclair,* 321 F.Supp. 1074 (E.D.Mich.1971), would have resulted in either the cessation of the warrantless wiretaps or the procurement of a warrant. It is unclear to me what "peril" Mitchell would have faced had he chosen either of these options.

Further, it is difficult to reconcile the majority's emphasis on the "reasonableness" of Mitchell's reliance on certain district court opinions with the "irrelevance" of Mitchell's disregard of internal Justice Department memoranda advising him that warrants were re-

quired. If the latter are irrelevant under *Har-*        *low,* I would assume the former would be also.