**Hedrick SMITH, et al., Plaintiffs,**

**v.**

**Richard M. NIXON, et al., Defendants.**

**Civ. A. No. 76–0798.**

United States District Court,
District of Columbia.

March 16, 1984.

See also, 582 F.Supp. 716.

Leon Friedman, New York City, Ralph C. Ferrara, Debevoise & Plimpton, Washington, D.C., for plaintiffs.

Larry Gregg, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

JOHN LEWIS SMITH, Jr., District Judge.

Plaintiffs Hedrick and Ann Smith and their children bring this action for monetary and injunctive relief under the First and Fourth Amendments and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* Defendants are Richard M. Nixon, Henry A. Kissinger, John N. Mitchell, H.R. Haldeman, John Ehrlichman, William C. Sullivan, and Cartha DeLoach.[1] Currently before the Court are the motions of all defendants for summary judgment on the damages claims, on the basis of official immunity.

The facts of the case are outlined in the earlier opinions of this Court, *Smith v. Nixon,* 449 F.Supp. 324 (D.D.C.1978), and the Court of Appeals, *Smith v. Nixon,* 606 F.2d 1183 (D.C.Cir.1979) *cert. denied* 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981). Limited discovery thereafter further details the events in question. In April 1969, after consulting with then-FBI Director Hoover and defendant Mitchell about the historical and legal basis for such an action, defendant Nixon authorized an electronic surveillance program designed to identify government employees who were disclosing confidential foreign policy information to the press. As the Court of Appeals described:

"Administration officials were concerned that continued disclosures might jeopardize national security. Surveillance targets were to be chosen according to three criteria: (1) those who had access to information that had 'leaked'; (2) those with unfavorable entries in their security files; and (3) those otherwise suspected by the FBI of involvement in leaking." *Id.* at 1186.

The program eventually resulted in the placing of seventeen wiretaps (Plaintiffs' Exhibit ("PX") 2). At the time Hedrick Smith was employed by *The New York Times* as a reporter in its Washington bureau.

On May 28, 1969, the National Security Council issued a "National Security Decision Memorandum," classified top secret, describing the American strategy for negotiations with Japan over the return of Okinawa to Japanese control (Defendants' Exhibits ("DX") D, C). The Memorandum noted that "the President is prepared to consider, at the final stages of negotiations, the withdrawal of [nuclear] weapons ... if other elements of the Okinawa agreement are satisfactory" (DX C). On June 3, 1969, *The New York Times,* in a story by Smith attributed to "well-placed informants," reported that "President Nixon has decided to remove American nuclear weapons from Okinawa, once an overall plan for turning the island back to Japanese rule has been agreed upon." The story noted that the decisions "had not yet been communicated formally to the Japanese Government but presumably will be made known in the course of negotiations with Tokyo [later in the year]." (DX B).

On June 4, 1969, defendant Kissinger and Director Hoover met at FBI headquarters in Washington (PX 3). On that same day, Hoover transmitted a memorandum to defendant Mitchell, stating in part:

"On this date Dr. Kissinger has requested that a telephone surveillance be placed on Hedrick L. Smith, who is also known as Rick Smith. He is a correspondent with 'The New York Times' and has been in contact with the individuals on whom telephone surveillances have been placed. He resides at 3409 Patterson Street, N.W., Washington, D.C., and has telephone number 363-7530. The files of

---

**1.** At the time of the events in question, defendant Nixon was President of the United States; defendant Kissinger was Assistant to the President for National Security Affairs; defendants Ehrlichman and Haldeman were Assistants to the President; defendant Mitchell was Attorney General of the United States; and defendants Sullivan (now deceased) and DeLoach were Assistant Directors of the Federal Bureau of Investigation.

this Bureau contain no pertinent information of an internal security nature concerning him.

"Upon your approval, a telephone surveillance will be placed on Hedrick L. Smith at his residence." (DX E).

Defendant Mitchell signed the memorandum as "approved," and a wiretap was placed on plaintiffs' home telephone. No warrant was ever sought or obtained.

The surveillance generated 107 pages of written logs (PX 1), and the FBI prepared and submitted reports in letter form to defendants Nixon and Kissinger. Reports dated July 31, August 1, and August 13, 1969, indicate that Smith talked with several government officials who expressed apprehension about further contacts with Smith (DX E). The reports also describe Smith's conversations with other *Times* reporters and individuals outside the government about contemporary political issues (DX E). On August 31, 1969, Hoover informed defendant Mitchell that the Smith surveillance was now "discontinued inasmuch as Smith has moved from the Washington, D.C. area" (DX E–36).

Plaintiffs filed this suit on May 10, 1976, alleging that the warrantless surveillance "deprived them of their First Amendment rights, constituted an unreasonable search and seizure under the Fourth Amendment, and did not comply with the requirements of Title III...." *Smith, supra,* 606 F.2d at 1186. On April 6, 1978, this Court granted defendants' motions to dismiss, holding that: 1) plaintiffs' claim was time-barred by the Statute of Limitations; 2)

confusion surrounding the meaning of Title III's national security provision, 18 U.S.C. § 2511(3), precluded application of that statute; and 3) the surveillance was not "unreasonable" and therefore not in violation of the Fourth Amendment. *Smith, supra,* 449 F.Supp. at 326. The Court of Appeals reversed. The Court held that: 1) the action was not time-barred; 2) Title III provided a damage remedy "if the Smiths can demonstrate that there was no reasonable national security rationale supporting the wiretapping," and 3) that the Fourth Amendment "reasonableness" inquiry required fuller factual development and consideration of "Smith's profession" as a "working journalist." *Smith, supra,* 606 F.2d at 1188–91.

■ The Court of Appeals remanded the case on July 12, 1979. Since that date, the Supreme Court and the Court of Appeals have re-examined the law of official immunity and its application in wiretapping litigation. *See Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (hereinafter *"Nixon"*); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (*"Harlow"*); *Ellsberg v. Mitchell,* 709 F.2d 51 (D.C.Cir.1983), *cert. denied sub nom. Russo v. Mitchell,* —— U.S. ——, 104 S.Ct. 1316, 79 L.Ed.2d 712, (*"Ellsberg"*); *Zweibon v. Mitchell,* 720 F.2d 162 (D.C.Cir.1983) (*"Zweibon IV"*). Because defendants' motions are based on official immunity grounds, the Court will consider them in light of these recent and significant doctrinal developments.[2]

**2.** Application of the principles established in these recent decisions is not barred by the law of the case doctrine. A lower court on remand, of course, generally cannot reconsider issues decided "either expressly or by necessary implication by the appellate court." *Gray Panthers v. Schweiker,* 716 F.2d 23, 38 (D.C.Cir.1983). *See also Maggard v. O'Connell,* 703 F.2d 1284, 1289 (D.C.Cir.1983); *City of Cleveland v. Federal Power Commission,* 561 F.2d 344, 346–47 (D.C.Cir. 1977). In its opinion here, the Court of Appeals held that the immunity issues on remand would be "controlled" by its decision in *Halperin v. Kissinger,* 606 F.2d 1192 (D.C.Cir.1979), *aff'd by an equally divided court,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981), *dismissed,* 578

F.Supp. 231 (D.D.C.1984). Moreover, by "necessary implication" the Court held that national security wiretaps in 1969 were subject to established Fourth Amendment "reasonableness" requirements. *See Smith, supra,* 606 F.2d at 1191. The law of the case doctrine, however, does not preclude "reexamination [of issues] in the light of *changes in governing law.*" *In re Multi-Piece Rim Products Litigation,* 653 F.2d 671, 678 (D.C. Cir.1981) (emphasis supplied). *See also Melong v. Micronesian Claims Commission,* 643 F.2d 10, 17 (D.C.Cir.1980); IB J. Moore, *Federal Practice* ¶ 0.404[1] (1983). Certainly *Nixon, supra,* and *Harlow, supra,* are intervening decisions by a "controlling authority" and should be applied to the immunity issues on remand. Similarly, the

### A. *Defendant Richard M. Nixon: Absolute Immunity*

■ Defendant Nixon bases his motion for summary judgment on the presidential immunity doctrine. In *Nixon, supra,* the Supreme Court held that a "former President is entitled to *absolute immunity* from damages liability predicated" on acts taken "within the outer perimeters of his official responsibility." 457 U.S. at 749, 756, 102 S.Ct. at 2705 (emphasis supplied). The Court emphasized the "singular importance" and "unique status" of a position "entrusted with ... responsibilities of utmost discretion and sensitivity." *Id.* at 749–50, 102 S.Ct. at 2702. In particular, the Court in *Nixon* and in *Harlow, supra,* characterized foreign policy and national security as " 'central' Presidential domains," where courts "traditionally show the utmost deference to Presidential responsibility...." *Harlow, supra,* 457 U.S. at 812 & n. 18–19, 102 S.Ct. at 2736, *quoting United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). *Cf. Haig v. Agee,* 453 U.S. 280, 307, 101 S.Ct. 2766, 2782, 69 L.Ed.2d 640 (1981).

At the hearing on this motion, plaintiffs conceded that the *Nixon* decision provides defendant Nixon with absolute immunity here. *See* Transcript of February 7, 1984, Oral Argument at 18. On March 7, 1984, the parties filed a stipulation to that effect, dismissing with prejudice plaintiffs' damages claims against Nixon, and obviating the need for a ruling on his motion. Accordingly, plaintiffs' damages claims against defendant Nixon are dismissed.

### B. *Defendants Henry A. Kissinger, John N. Mitchell, H.R. Haldeman, John Ehrlichman, William C. Sullivan and Cartha DeLoach: Qualified Immunity*

The remaining defendants move for summary judgment under the qualified immunity doctrine established in *Harlow, supra.*

In *Harlow,* the Supreme Court "jettisoned the subjective, fact-oriented element of qualified immunity and recast the doctrine in terms of objective good faith." *McSurely v. McClellan,* 697 F.2d 309, 316 (D.C.Cir. 1982). Under the new "objective" test:

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow, supra,* 457 U.S. at 818, 102 S.Ct. at 2739.

Judicial inquiries into an official's "subjective intent" or "subjective motivations" are no longer necessary or even permitted; the court examines only the "objective reasonableness of an official's conduct, as measured by reference to 'clearly established' law." *Id.* at 816–18. The Court added that "until this *threshold* immunity question is resolved, *discovery should not be allowed*." *Id.* at 818, 102 S.Ct. at 2739 (emphasis supplied). As the Court of Appeals described the analysis, "once an official's conduct has been ascertained, the determinative question will be what rules were clearly established at the time he acted." *Ellsberg, supra,* 709 F.2d at 69. If the law was not settled at that time, the "inquiry ceases ... at the point the official is entitled to summary judgment as a matter of law." *Zweibon IV, supra,* 720 F.2d at 168. *See also Gray v. Bell,* 712 F.2d 490, 496 (D.C.Cir.1983); *National Black Police Ass'n, Inc. v. Velde,* 712 F.2d 569, 573–74 (D.C.Cir.1983); *McSurely v. McClellan, supra,* 697 F.2d at 316, 320–21.

Defendants' qualified immunity position is straightforward. First, defendants argue, the Smith surveillance was a "national security wiretap," based on legitimate official concern about leaks of sensitive foreign policy information to the press. Second, the Court of Appeals recently deter-

---

Court of Appeals' decision in *Zweibon IV, supra,* involving the applicable constitutional requirements on wiretaps at the time of the Smith surveillance, should be given effect. The risk of "divergent results" in similar cases, *Laffey v.*

*Northwest Airlines, Inc.,* 642 F.2d 578, 586 (D.C. Cir.1980), is particularly acute given the "celebrated uncertainty," *Ellsberg, supra,* 709 F.2d at 71 (MacKinnon, J., concurring in part and dissenting in part), of this area of the law.

mined that the law was unsettled with respect to national security wiretaps at the time of the Smith surveillance. *See Zweibon IV, supra,* 720 F.2d at 170. *See also Sinclair v. Kleindienst,* 645 F.2d 1080, 1082–85 (D.C.Cir.1981). Because the "rules [regarding such surveillances] were [not] 'clearly established' at the time they acted," *Ellsberg, supra,* 709 F.2d at 69, defendants contend that they are entitled to summary judgment. *See Zweibon IV, supra,* 720 F.2d at 168–70; *Halperin v. Kissinger, supra,* 578 F.Supp. 231, at 234.

Plaintiffs urge that summary judgment is inappropriate because there exists a genuine issue of fact as to the *purpose* of the tap. According to plaintiffs, defendants have "failed to prove the factual predicate for their position, *i.e.,* that the Smith wiretap was *actually* a national security wiretap." Plaintiffs correctly observe that the substantive rules of electronic surveillance—*i.e.,* whether the Constitution or Title III requires a warrant—turn on whether the tap is characterized as a "national security tap" or a "non-national security tap." *See United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Ellsberg, supra,* 709 F.2d at 65–68; *Halperin v. Kissinger, supra,* 606 F.2d at 1201–02. Courts have long inquired into the "reasons" for or "purposes" of a challenged surveillance, and the Court of Appeals has warned that "courts must be alert to the possible *pretextuality* " of a "national security" claim. *Chagnon v. Bell,* 642 F.2d 1248, 1260 (D.C. Cir.1980), *cert. denied* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981) (emphasis supplied). *See also Sinclair v. Kleindienst, supra,* 645 F.2d at 1083–84; *Halperin v. Kissinger, supra,* 606 F.2d at 1202. Indeed, the Court of Appeals directed this court on remand to carefully examine the

"national security rationale for this surveillance," and to reject any "bland assurances" by defendants that the "situation represented a national security problem requiring electronic surveillance." *Smith, supra,* 606 F.2d at 1188.[3] Plaintiffs contend that discovery on the purpose issue, including depositions of defendants, is necessary, and, at minimum, discovery is necessary under Fed.R.Civ.P. 56(f) for plaintiffs to fairly oppose defendants' summary judgment motions. By contrast, defendants argue that the "objective record" establishes the national security rationale for the surveillance, and that, in any event, *Harlow* proscribes discovery until the "threshold" immunity question is resolved on summary judgment.

Although the Supreme Court in *Harlow* "consciously sought to facilitate summary disposition" in suits against government officials, *McSurely v. McClellan, supra,* 697 F.2d at 316, the precise interaction between *Harlow* and the strict requirements of Rule 56 is not entirely clear. Two decisions by the Court of Appeals are illustrative. In *McSurely v. McClellan,* the Court noted that *"Harlow* does not purport to change the operation of Rule 56 in immunity cases." *Id.* at 321 n. 20. In *National Black Police Ass'n v. Velde, supra,* the Court observed that *"Harlow* substantially altered the standards governing motions for summary judgment in cases involving claims of qualified immunity." 712 F.2d at 573. Rule 56, of course, requires that the moving party demonstrate, by affidavits, "pleadings, depositions, answers to interrogatories, and admissions on file," that there is no genuine issue as to any material fact, yet *Harlow* expressly *bars* discovery until the immunity issue is decided, on the grounds that the immunity doc-

---

**3.** The Court of Appeals further instructed this Court to:

"note that Smith did not satisfy the three criteria established by the Nixon Administration for identifying surveillance subjects. He had no personal access to confidential information that might be disclosed in the future, and, according to the memorandum to the Attorney General apparently requesting the wiretap, the Government had no information on him 'of an internal security nature.' Consequently, there seems to have been little reason to believe, under the Government's own guidelines, that Smith posed a continuing security risk. Of course, the outcome of this inquiry will hinge on facts adduced in the trial court..." *Id.* (footnote omitted).

trine is in part designed to protect officials from the "burdens of broad-reaching discovery." *Harlow, supra,* 457 U.S. at 818. *Cf. Zweibon IV, supra,* 720 F.2d at 171. At the very least it can be said that *Harlow* renders certain facts no longer "material" within the meaning of Rule 56: "subjective motivation" and "intention" are of no legal significance after *Harlow* and may not be the subject of inquiry. *See Harlow, supra,* 457 U.S. at 816–17. That conclusion, unfortunately, does not answer the question of whether "purpose" is classified as a matter of (immaterial) "motivation" or (material) "conduct," a question made harder by the doctrinal necessity of determining whether the tap was based on a valid "national security rationale."

The two post-*Harlow* Court of Appeals decisions involving electronic surveillance do not resolve the problem. . In *Ellsberg, supra,* the Court declined to rule upon defendants' qualified immunity claims, stating that "a decision on this matter will require *some factual findings* concerning the *purposes* of and circumstances surrounding the tap. Determinations of that order should be made in the first instance by the District Court." 709 F.2d at 68 n. 73 (emphasis supplied). In *Zweibon IV, supra,* the Court considered plaintiff's argument that a warrantless surveillance "undertaken primarily for prosecutorial [rather than national security] purposes violated 'clearly established' law." 720 F.2d at 173 n. 18 (quoting Brief for Appellants at 56). The Court rejected that position

> "We dismissed this argument in *Chagnon v. Bell,* concluding that there exist no clear standards for defining or evaluating the "purpose" of a warrantless national security wiretap. Consequently, allegations of prosecutorial purpose raise

no genuine issues relevant to the defense of qualified immunity. 642 F.2d at 1062 n. 25." *Id.*

The Court's sweeping statement that allegations regarding the true "purpose" of a warrantless national security wiretap are irrelevant should be viewed in context. *Chagnon v. Bell* involved the "foreign agent" exception to the warrant requirement, and the *Chagnon* court specifically distinguished "political pretext" cases, including this one. *See Chagnon v. Bell, supra,* 642 F.2d at 1260 & n. 25; *cf. Ellsberg, supra,* 709 F.2d at 71 (MacKinnon, J., concurring in part and dissenting in part).

This Court on two occasions has addressed the "improper purpose" problem in wiretap cases. On remand in *Ellsberg,* (and before *Zweibon IV* was announced), plaintiff argued that summary judgment on qualified immunity grounds was inappropriate because he had no opportunity to conduct discovery related to defendant's "motives" and "reasons" for ordering a surveillance. Judge Pratt rejected this argument: "the Supreme Court's purpose in formulating a new qualified immunity test [in *Harlow* ] was to prevent the sort of investigation into motives which plaintiff seeks to undertake." *Ellsberg v. Mitchell,* CA No. 1979–72 (D.D.C. July 22, 1983), slip op. at 3. Judge Pratt concluded that the "objective record ... establishes a valid rationale for the surveillance. *Harlow precludes us from continuing further and asking if national security was the actual or only reason for defendant's conduct."* *Id.* at 4 (emphasis supplied). Similarly, this Court in *Halperin v. Kissinger, supra,* rejected a "political purpose" argument and found that the "objective record ... reflects a rational national security concern." Slip op. at 7.[4]

---

4. The difficulties of the relationship between the substantive law of electronic surveillance and *Harlow's* proscription of discovery are thrown into sharp relief by this case. Unlike *Ellsberg, Halperin,* and *Zweibon IV,* where significant discovery had taken place before *Harlow* was decided, discovery in this case has been limited. Indeed, in accordance with *Harlow,* this Court on November 22, 1982, stayed all discovery

pending resolution of the immunity issues, with the result that the "objective record" here is not as physically extensive as in the other wiretapping cases. Plaintiffs' insistence that adequate development of the "objective record" requires deposition testimony, *see* Transcript of Oral Argument at 22–23, simply cannot be squared with *Harlow's* characterization of deposition discovery as a particularly undesirable procedure

The district court decisions in *Ellsberg* and *Halperin* reflect a workable, if not entirely elegant, solution to the problems presented in "improper purpose" wiretap cases after *Harlow*. It is obvious that some documentation of the challenged wiretap must be produced; it is equally obvious that deposition questions regarding "purpose" or "rationale" are not segregable from improper inquiries into "motive." These considerations tug in opposite directions, but it appears that *Harlow's* insistence on "objective" criteria and the "social costs" of immunity litigation mandate the approach taken in *Ellsberg* and *Halperin.* If the documentary record of the surveillance establishes a basis for rational national security concerns on the part of the defendant officials, then the tap may be characterized as a "national security tap" and the inquiry as to conduct is completed. The next step is the "purely legal" determination of whether the rules regarding such surveillances were "clearly established" at the time of the tap.

In this case, as the Court of Appeals observed, the challenged surveillance was part of a presidentially-approved program designed to identify government officials who were leaking confidential foreign policy information to the press. *Smith, supra,* 606 F.2d at 1186 ("Administration officials

were concerned that continued disclosures might jeopardize national security.") *Cf. Haig v. Agee, supra,* 453 U.S. at 307 ("Protection of the foreign policy of the United States is a governmental interest of great importance, since foreign policy and national security considerations cannot neatly be compartmentalized.") The authorization memorandum from the FBI Director to the Attorney General (defendant Mitchell) notes that Smith had been in contact with other subjects of surveillance. Smith's June 4, 1969, article directly reflects the contents of a secret National Security Council memorandum setting forth American strategy in upcoming negotiations with a foreign government. The record thus reveals a basis for "rational national security concerns" on the part of the officials involved in the surveillance. In view of the fact that in 1969 there were no "clearly established" warrant and reasonableness requirements regarding such surveillances, the Court concludes that defendants are entitled to summary judgment on the grounds of qualified immunity. *See Zweibon IV, supra,* 720 F.2d at 170, 173. In view of the foregoing,[5] the Court need not reach the absolute immunity or statute of limitations issues raised by defendants.

Accordingly, the motions of Henry A. Kissinger, John N. Mitchell, H.R. Haldeman, John Ehrlichman, William C. Sullivan

in immunity litigation. *See Harlow, supra,* 457 U.S. at 817, 102 S.Ct. at 2738.

Courts in contexts other than electronic surveillance have viewed in various ways the nature and resolution of factual questions and the role of discovery after *Harlow. Compare McSurely v. McClellan, supra,* 697 F.2d at 321 n. 20 (factual disputes "may arise even under the objective test") *with Donohoe v. Watt,* 546 F.Supp. 753, 756 (D.D.C.1982), *aff'd,* 713 F.2d 864 (D.C.Cir.1983) (resolution of immunity question "precede[s] discovery ... before any consideration is given to the existence of factual issues."). *See also Harlow, supra,* 457 U.S. at 821, 102 S.Ct. at 2740 (Brennan, J., concurring); *Anderson v. Coughlin,* 700 F.2d 37, 48 (2d Cir. 1983) (Kearse, J., dissenting); *Gladden v. Berry,* 558 F.Supp. 676, 678–79 (D.D.C.1983); *Smith-Bey v. District of Columbia,* 546 F.Supp. 813, 814–815 (D.D.C.1982); *Dale v. Bartels,* 552 F.Supp. 1253, 1266 n. 1 (S.D.N.Y.1982); *Heslip v. Lobbs,* 554 F.Supp. 694, 701 n. 6 (E.D.Ark.1982); *Nakao v. Rushen,* 545 F.Supp. 1091, 1093 (N.D. Cal.1982). In any event, the Court of Appeals

has firmly established that discovery in wiretapping cases is subject to stringent restrictions: "we are reticent to allow appellants to benefit from the fruits of discovery that took place before *Harlow* was decided." *Zweibon IV, supra,* 720 F.2d at 171 (footnote omitted.). Plaintiffs' Fed.R.Civ.P. 56(f) motion must therefore be denied.

5. Defendants' entitlement to immunity on the constitutional claim also entitles them to immunity on the Title III claim. *See Chagnon v. Bell, supra,* 642 F.2d at 1260 n. 22. Moreover, the national security basis of the surveillance precludes application of the statute. *See Smith, supra,* 606 F.2d at 1188 & n. 22. *Cf. Zweibon v. Mitchell,* 606 F.2d 1172, 1181–82 (D.C.Cir.1979), *cert. denied* 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981) (*Zweibon III*) (barring retroactive application of *Zweibon I's* interpretation of Title III regarding national security wiretaps).

and Cartha DeLoach for summary judgment are granted.