807 F.2d 197
 257 U.S.App.D.C. 52
 Hedrick SMITH and Ann B. Smith, Suing Individually and on
Behalf of Their Minor Children, Laurel Ann Smith,
Jennifer Laurence Smith and Sterling
Scott Smith, Appellants,
v.
Richard M. NIXON, et al.
 No. 84-5240.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 1, 1985.
Decided Dec. 5, 1986.
 
 Appeal from the United States District Court for the District of Columbia, (Civil Action No. 76-00798).
 Leon Friedman, with whom Ralph C. Ferrara, Washington, D.C., was on the brief, for appellants. Robert J. Geniesse, Washington, D.C., entered an appearance for appellants.
 Larry L. Gregg, Atty., U.S. Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Joseph E. diGenova, U.S. Atty., Barbara L. Herwig, Atty., U.S. Dept. of Justice, William D. Rogers and Bruce M. Chadwick, Washington, D.C., of counsel for appellee Kissinger were on the brief, for appellees.
 Before ROBINSON and MIKVA, Circuit Judges, and SCALIA,* Circuit Justice.
 Opinion for the Court filed by Circuit Justice SCALIA.
 
 SCALIA, Circuit Justice:
 
 1
 This suit for damages and equitable relief against several former and current federal officials arises out of an 89-day illegal wiretap of reporter Hedrick Smith's home telephone in 1969. The District Court granted summary judgment to the officials on qualified immunity grounds without resolving appellants' pending discovery requests. This is the second of three cases we decide today in which resolution of the officials' qualified immunity defense turns on the validity of their assertions that their actions were prompted and justified by national security concerns. See Halperin v. Kissinger ("Hallperin II "), 807 F.2d 180, (D.C.Cir. 1986); Ellsberg v. Mitchell ("Ellsberg II "), 807 F.2d 204, (D.C.Cir.1986). The principal issue is what showing a plaintiff must make before being permitted to engage in discovery to establish that no reasonable basis for a national security wiretap existed.
 
 
 2
 * The challenged wiretap, like the wiretaps at issue in the companion cases, see Halperin II, 807 F.2d at 182-183; Ellsberg II, 807 F.2d at 205-206, was purportedly conducted pursuant to a presidentially approved surveillance program launched in May 1969 to identify government employees who were leaking sensitive national security information. See generally Smith v. Nixon ("Smith I "), 606 F.2d 1183, 1186-87 (D.C.Cir.1979), cert. denied, 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981). On June 3, 1969, just as negotiations with the Japanese on the reversion of Okinawa were getting under way, the New York Times published a front-page article by Diplomatic Correspondent Hedrick Smith detailing the Nixon Administration's fallback negotiating position. U.S. Said to Plan an Okinawa Deal Barring A-Bombs, N.Y. Times, June 3, 1969, at 1, col. 6. The article, which reflected the contents of a top secret National Security Decision Memorandum imputed the information to "well-placed informants." Id.
 
 
 3
 The next day, Federal Bureau of Investigation ("FBI") Director J. Edgar Hoover sought authorization from former Attorney General John Mitchell to wiretap Smith's residential telephone. The authorization memorandum, describing the wiretap program as a "matter of most grave and serious consequence to our national security," I Joint Appendix ("J.A.") 105, indicated that then National Security Advisor Henry A. Kissinger requested the Smith wiretap, id; see id. at 109, 110. The memorandum noted that Smith had been in contact with other surveillance targets, but it made no mention of Smith's Okinawa article and noted that FBI files "contain[ed] no pertinent information of an internal security nature concerning him." Id. at 105.
 
 
 4
 The wiretap, approved and installed the same day, remained in place for 89 days, until the Smiths moved out of Washington, D.C., on August 31, 1969. FBI summary letters were forwarded to President Nixon (through presidential aide John Ehrlichman) and Kissinger. The government concealed the existence of the wiretap until May 11, 1973. Three years later, Smith and his family sued several federal officials (including President Nixon, who was later dismissed by stipulation) for monetary and equitable relief,[1] alleging that the wiretap and subsequent disclosures of its fruits violated their first, fourth, and ninth amendment rights and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90-351, 82 Stat. 197, 211 (current version as amended by Title II of the Foreign Intelligence Surveillance Act of 1978, Pub.L. No. 95-511, 92 Stat. 1783, 1796, codified at 18 U.S.C. Secs. 2510-2520 (1982)).
 
 
 5
 The District Court dismissed the case on the merits and also held the action time-barred. Smith v. Nixon, 449 F.Supp. 324 (D.D.C.1978). We reversed and remanded to the District Court on the basis of our decision in Halperin v. Kissinger ("Halperin I "), 606 F.2d 1192 (D.C.Cir.1979), aff'd in part by an equally divided Court, cert. dismissed in part, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981), and directed the District Court to determine, inter alia, whether there was a "reasonable national security rationale supporting the wiretapping" for the purpose of determining the availability of a cause of action under Title III. Smith I, 606 F.2d at 1188.
 
 
 6
 On remand, the District Court, relying on the Supreme Court's intervening "objectification" of the qualified immunity defense in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), granted defendants summary judgment on the damage claims. Smith v. Nixon, 582 F.Supp. 709 (D.D.C.1984). The court declined to permit any further probing into the wiretap's actual purpose once the documentary evidence already obtained through discovery "establishe[d] a basis for rational national security concerns," id. at 715, because " 'subjective motivation' and 'intention' are of no legal significance after Harlow and may not be the subject of inquiry," id. at 714 (citation omitted). The District Court also dismissed on the pleadings plaintiffs' request for the expungement of all government records of the wiretap. Smith v. Nixon, 582 F.Supp. 716 (D.D.C.1984). Instead, the court ordered the FBI summary logs of the wiretap sealed, "except as required to fulfill the statutory records preservation and disposal obligations of the [FBI] and the National Archives and Records Service." Id. at 717 (citing 44 U.S.C. Secs. 2103, 3303). Plaintiffs appeal both judgments.
 
 II
 
 7
 The primary evil that moved the Harlow Court to abandon the subjective elements of the qualified immunity defense was the prospect of "broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues." Harlow, 457 U.S. at 815-16, 102 S.Ct. at 2736-37. Such diversions, the Court observed, "can be peculiarly disruptive of effective government," id. at 817, 102 S.Ct. at 2738 (footnote omitted), and "implicate separation-of-powers concerns," id. at 817 n. 28, 102 S.Ct. at 2737-38 n. 28. The Court admonished that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738; see Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985).
 
 
 8
 In keeping with Harlow's command, we subject damage actions against government officials to a heightened pleading standard. Bare allegations of improper purpose, like the bare allegations of malice rejected in Harlow, 457 U.S. at 817-18, 102 S.Ct. at 2737-38, do not suffice to drag officials into the mire of discovery, Hobson v. Wilson, 737 F.2d 1, 29-31 (D.C.Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). As we said in Hobson, "in cases involving a claim that defendants acted with an unconstitutional motive, we will require that nonconclusory allegations of evidence of such intent must be present in a complaint for litigants to proceed to discovery on the claim." Id. at 29. In Halperin II, 807 F.2d at 188, we held that objective reasonableness of national security motivation is all that need be established to sustain that element of the qualified immunity defense consisting of the contention that the acts complained of were validated by a national security purpose--at least where, as here, the defendants purported to be acting for such a purpose at the time (and assuming, of course, that national security motivation would in law justify the actions, or could reasonably have been thought to do so at the time). It follows that once an official who concededly claimed to have been acting for validating national security reasons has alleged facts that furnish a rational national security basis for the challenged conduct, the court must dismiss the suit on the pleadings unless the plaintiff contradicts those facts or alleges other specific and concrete facts that raise a genuine issue as to the objective reasonableness of the national security basis.
 
 III
 
 9
 Applying the heightened pleading requirement to this case, we consider first defendants' allegations relating to the reasonableness of a national security basis for the wiretap. We then consider, in turn, the concrete factual allegations in plaintiffs' complaint and those concrete assertions that plaintiffs could make were they now to be permitted to supplement their complaint with facts that they have learned through document discovery.
 
 
 10
 * A defendant's "bland assurances"--contemporaneous or post hoc--"That a situation did, in fact, represent a national security problem requiring electronic surveillance," Smith I, 606 F.2d at 1188, do not establish the wiretap's objective rationality. Rather, defendants must allege objective facts that place the wiretap in a credible national security context. Here they suggest two: Smith's premature disclosure of the Okinawa negotiating strategy in the New York Times, and his contacts with suspected leakers who were already targeted for electronic surveillance in the name of national security.
 
 
 11
 These allegations, in combination, plainly suffice to establish the reasonableness of national security motivation. See Haig v. Agee, 453 U.S. 280, 308, 101 S.Ct. 2766, 2782-83, 69 L.Ed.2d 640 (1981); Halperin II, 807 F.2d at 189-191. Plaintiffs' demand that defendants further establish "a causal connection between" the Okinawa article and their wiretapping decision, Reply Brief for Appellants at 17 & n.*, amounts to a demand for proof of subjective motivation, proscribed by Harlow. We conclude that, unless plaintiffs' complaint alleges concrete facts contradicting these assertions or otherwise casting doubt on the objective reasonableness of the national security justification, dismissal was warranted.[2]
 
 B
 
 12
 Aside from naked assertion that a national security purpose would have been unreasonable, see Amended Complaint p 35, the allegations in the complaint arguably bearing upon this issue fall into three categories.
 
 
 13
 The first category tends to prove no more than that defendants' actual purpose was something other than the protection of national security--for example, allegations that the records of the Smith wiretap were not filed in the "regular national security files of the FBI," id p 29, and were distributed years later to unusual recipients such as Haldeman and Ehrlichman, id. p p 28-30, coupled with the charge that the object of the wiretap was "to monitor the sources of [Smith's] news stories which were personally embarrassing to high government officials," id. p 34. All of this goes to subjective intent--which, as we have discussed above, is irrelevant.
 
 
 14
 The second category describes the manner in which plaintiffs used their telephone, and thus the types of conversations that defendants could have expected to (and did) intercept. That plaintiffs "frequently communicated their political and other views ... in telephone conversations," id. p 25, says nothing of the objective reasonableness of a national security motivation for the wiretap. Even the most devoted KGB agent does not use his phone only for spying. Similarly, that Smith "spoke to numerous persons on his home telephone both in and outside of government [who] would supply [him] with facts and opinions on which he would base his stories," id. p 26, does not confute (and indeed reinforces) the rationality of a national security motivation.
 
 
 15
 The third category consists of the allegation that "[a]t no time during the period of the interceptions did the plaintiffs ... act as agents of or in collaboration with a foreign power, its agents or agencies." Id. That fact (assuming its truth) is likewise inadequate to suggest the irrationality of national security motivation. It was not clearly established at the time of the challenged wiretap that Title III's national security exemption turned on the target's affiliation with a foreign intelligence operative. Halperin II, 807 F.2d at 184-185. Even that portion of the Title III exemption that referred to the "protec[tion] [of] national security information from foreign intelligence activities," see 18 U.S.C. Sec. 2511(3) (1976), is not obviously inapplicable to the protection of that information from foreign intelligence collection through published sources. And it was even more reasonable (and a fortiori not clearly unreasonable) to consider the wiretap covered by several other portions of the exemption that make no reference whatever to foreign intelligence such as that for "such measures as [the President] deems necessary to protect the United States ... against any ... clear and present danger to the structure or existence of the Government," id. See Halperin II, 807 F.2d at 185. We conclude that the facts pleaded by the plaintiffs did not cast doubt on the reasonableness of the national security motivation established by defendants' allegations.
 
 C
 
 16
 The deficiency of the complaint under the heightened pleading standard would be evident even if we were to deem the complaint amended, see FED.R.CIV.P. 15(b), to include the factual material that they acquired as a result of the discovery that should not (in light of the inadequacy of the original complaint) have been allowed. But cf. Zweibon v. Mitchell ("Zweibon IV "), 720 F.2d 162, 171 (D.C.Cir.1983) (dictum) (court is "reticent" to permit plaintiffs "to benefit from the fruits of discovery that took place before Harlow was decided"), cert. denied, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984). This includes two further evidentiary elements that, according to appellants, raise a genuine issue about the reasonableness of a national security purpose. The first is the existence of three cumulative criteria that the Nixon Administration enumerated for selecting surveillance targets under the "anti-leak" program, which criteria the Smith wiretap did not satisfy: "(1) access to sensitive data that was being revealed publicly; (2) information in security files that 'raised questions' about an individual; and (3) other incriminating information in FBI files." Halperin I, 606 F.2d at 1196 (footnote omitted); Smith I, 606 F.2d at 1186. If these criteria could plausibly be thought to have been exclusive, they would bear upon a proper objective evaluation of the qualified immunity defense only to the extent that what defendants contemporaneously thought to be the indispensable conditions for a rational national security investigation is evidence of what the indispensable conditions in fact were. Plaintiffs produced no facts, however, establishing that these criteria were exclusive, and it is utterly implausible that they were so. Rather, they appear to have been a test for determining when national security wiretaps would routinely be approved with regard to government employees and consultants, a category of individuals that does not include these plaintiffs. Only such individuals would have "access" to sensitive data. See Smith I, 606 F.2d at 1188. (Even as to those individuals it is unlikely that no wiretaps beyond those satisfying all three criteria would be approved--unless it is to be believed that a person who (1) had access to sensitive data that was being revealed publicly, and (2) was the subject of "questions raised" in security files, but (3) did not happen to be the subject of "other incriminating information" in FBI files, could not be targeted, even if he were seen surreptitiously passing papers to a journalist in whose column the sensitive data appeared the next day.) It is impossible to think, or to think that defendants ever thought, that the criteria categorically forbade the targeting of persons who were not employees or consultants, but who were known to be regularly soliciting, or even purchasing, the delivery of classified information. In sum, it seems to us that, despite the criteria, it would have been perfectly reasonable to ground the wiretap in the present case on Smith's own trumpeted admission that he received classified information from "well-placed informants."
 
 
 17
 The second new element disclosed, according to plaintiffs, by subsequently introduced evidence, is that FBI logs of the wiretap "reveal an interest in everything but national security leaks" and "only two [logged conversations] are between Smith and a government employee[,] neither of [which] deals with anything resembling a leak." Brief for Appellants at 33-34 (footnote omitted). The manner in which the wiretap was executed, however, is evidence not of the rationality of a putative national security purpose, but of the wiretap's actual purpose (and perhaps of its reasonableness under the fourth amendment, a claim that plaintiffs have abandoned).[3] And just as "a search is not to be made legal by what it turns up," United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 229, 92 L.Ed. 210 (1948) (footnote omitted), the fact that, ex post, a wiretap is seen to have been unsuccessful in developing national security information does not establish that, ex ante, it was not reasonable to conduct it for that purpose.
 
 
 18
 Since, however, plaintiffs' claim that the wiretap did not intercept any evidence implicating Smith in a leak bears on the rationality of continuing the wiretap in the name of national security, see Halperin II, 807 F.2d at 191-192, we must go on to note that the claim is in any case not an accurate portrayal of the record facts. The wiretap intercepted conversations that defendants could reasonably have interpreted to implicate Smith in past leaks. See Smith, 582 F.Supp. at 711. A July 31, 1969 summary letter that Hoover forwarded to Nixon and Kissinger recounted Smith's story to a fellow reporter that an unidentified State Department employee told Smith that in light of recently publicized leaks, including "[Smith's] story on Okinawa[,] ... he couldn't come around to see him anymore" because security had "just 'gotten so tight,' " J.A. 137, 139. A second summary letter, dated August 1, identified by name one of Smith's government contacts, who "told Smith that everyone is telling [him] not to see Smith," and that Smith "had been a bad boy for breaking a couple of stories." Id. at 144, 149. The interceptions through the beginning of August, while not incriminating, certainly did nothing to allay reasonably held national security concerns. The wiretap was discontinued at the end of that month.
 
 
 19
 We sympathize with plaintiffs' cri de coeur that dismissal of their case without permitting them discovery "deprives [them] of the right to prove their case or even to have contrary facts considered on defendants' motion for summary judgment." Brief for Appellants at 4. But that, alas, is exactly what immunity means: that the ability to obtain monetary damages for a wrong must sometimes yield to the need to protect public officials (and ultimately the public itself). That need is particularly acute in the national security context. See Halperin II, 807 F.2d at 187-188. Thus, there inevitably are circumstances in which the greater public interest in national security "compels the subordination" of an individual's interest in receiving damages for what might otherwise be a compensable injury. Halkin v. Helms, 690 F.2d 977, 1001 (D.C.Cir.1982).[4]
 
 IV
 
 20
 Plaintiffs also appeal that part of the District Court's judgment on equitable relief affording the FBI an opportunity to evaluate whether the wiretap summary logs have sufficient "historical" or "research" value, see 44 U.S.C. Secs. 3303-3303a (1982), to "warrant their continued preservation," id. Sec. 3303a(a), and transmittal to the National Archives, see id. Sec. 2103. Smith v. Nixon, 582 F.Supp. 716, 717 (D.D.C.1984). The District Court believed such a review necessary to permit the FBI and the National Archives "to fulfill [their] statutory records preservation and disposal obligations," 582 F.Supp. at 717.
 
 
 21
 As we held before in response to the same line of reasoning, the provisions directing the disposal of government documents "must yield to statutory or constitutional rights elsewhere granted." Hobson v. Wilson, 737 F.2d 1, 64 (D.C.Cir.1984) (citation omitted), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). There is no dispute that the challenged wiretap was illegal (albeit not in violation of clearly established law). See United States v. United States District Court, 407 U.S. 297, 321, 92 S.Ct. 2125, 2138-39, 32 L.Ed.2d 752 (1972). The provisions on which the government relies "effect[ ] no repeal of other provisions ... and must bow to them when they are more specific, as of course it must bow to the Constitution." Hobson, 737 F.2d at 64 (quoting Chastain v. Kelley, 510 F.2d 1232, 1236 n. 4 (D.C.Cir.1975)). Thus, a court may order expungement of records in an action brought under 5 U.S.C. Sec. 552a(e)(7) (1982) (Privacy Act of 1974), or directly under the Constitution, without violating the intricate statutory provisions that purport to be the "exclusive" means by which "records of the United States Government may ... be alienated or destroyed," 44 U.S.C. Sec. 3314. See Hobson, 737 F.2d at 64; Albright v. United States, 631 F.2d 915, 921 (D.C.Cir.1980) (Privacy Act); Paton v. La Prade, 524 F.2d 862, 868-69 (3d Cir.1975) (direct action under Constitution). Accordingly, we remand plaintiffs' request for equitable relief to the District Court for decision according to the considerations we outlined in Hobson, 737 F.2d at 65-66. See also Reuber v. United States, 750 F.2d 1039, 1068-69 (D.C.Cir.1984) (Bork, J., concurring).
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 We affirm the grant of summary judgment against plaintiffs' damage action and remand plaintiffs' equitable relief claim for action consistent with this opinion.
 
 
 25
 So ordered.
 
 
 
 *
 Justice Scalia was a judge of this Court when this case was briefed and argued, and is a designated Circuit Justice of this Circuit on the date of this decision. See 28 U.S.C. Secs. 42, 43(b) (1982)
 
 
 [1]
 The defendants remaining in this action are Kissinger, Mitchell, Ehrlichman, former FBI Assistant Directors William C. Sullivan (now deceased) and Cartha De Loach, and Nixon's chief administrative aide, H.R. Haldeman, all in their personal and official capacities. The current FBI Director and Attorney General are sued in their official capacities for purposes of the equitable relief claims
 
 
 [2]
 Plaintiffs maintain that we are bound by our earlier statement in this case that, because defendants demonstrated no link between the appearance of the Okinawa article and initiation of the wiretap, "there is nothing in the record before us that contradicts [plaintiffs'] allegation that the wiretap was initiated [for a purpose that] ... involved no danger to national security." Smith I, 606 F.2d at 1188. We would, of course, be bound by that statement (as it relates to evidence that was then before us) if it were still relevant to our inquiry. However, the qualified immunity inquiry that we now pursue, no longer turns on the actual purpose that we were then addressing. Cf. id. at 1188 n. 22
 
 
 [3]
 Apparently in light of our cases stating that the contours of the fourth amendment's reasonableness requirement in the national security context were too nebulous at the time of the challenged wiretap to have been clearly established, see Zweibon IV, 720 F.2d at 169-70; Sinclair v. Kleindienst, 645 F.2d 1080, 1082 (D.C.Cir.1981) (dictum), plaintiffs do not address that claim on appeal. Cf. Brief of Appellees at 18. Compare Halperin II, 807 F.2d at 192-193
 
 
 [4]
 Plaintiffs' complaint alleges that defendants' dissemination of the intercepted information to other public officials violated their first, fourth, and ninth amendment rights. See Amended Complaint p 39. To the extent that resolution of the qualified immunity defense as to those claims is any different, plaintiffs have waived them by failure to pursue them on appeal. See Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983); FED.R.APP.P. 28(a)(4). In light of our disposition of the constitutional claims, we need not address defendants' argument that they are time-barred